SEWALL and others *vs.* S. & M. ALLEN.

A *steam-boat company*, or the members thereof, who, by their act of incorpora-
tion, are made individually liable as *common carriers*, incorporated for the
transportation of *goods, wares and merchandise*, are not common carriers of
packages of *bank bills*, unless it be shewn that they have made the carriage
of such packages a part of their *ordinary business*; and it was accordingly
*holden* in this case that the defendants, members of such a company, were
not liable for the loss of a package of bank bills entrusted to the master of
one of their boats; it appearing that he had been forbidden by his employ-
ers to carry money, that he had never knowingly carried any, that the
*usage* was for persons sending money to compensate the masters, and that
the owners charged freight only on *specie.*

ERROR from the supreme court. S. and M. Allen brought
their suit in the supreme court against H. D. Sewall and *sev-
en* others, to recover for the loss of a package of bank bills
of the value of $14,347 $\frac{50}{100}$, and a draft of $1800, entrusted
to the care of the master of a steam-boat belonging to an in-
corporated company, called *The Dutchess and Orange Steam-
boat Company*, to be carried from New-York to Albany. The
company consisted of *thirty-six* stockholders, *eight* of whom
only were sued. By the act incorporating the company, it
is declared that the members of the corporation shall be lia-
ble *individually*, in the same manner as *carriers at common law*,
for the transportation of all *goods, wares* and *merchandise* de-
livered to the agents of the corporation, and for all contracts
made by such agents relating to the business of the corpora-
tion, *Statutes of* 1825, *p.* 336, *et seq.*; and by another provis-
ion of the act, the company are prohibited from employing
their capital in any objects other than those connected with
the navigation of the Hudson river, by boat or boats propel-
led by steam. The company had a steam-boat called *The
Eckford*, and tow-boats for the carriage of freight, and an-
other steam-boat called *The Sun*, employed in the transporta-
tion of passengers. The *Sun* was not advertised as a *freight
boat*; she however carried light freight; and when she did
so, it was considered a matter of favor, and the company
charged an extra price for it; boxes were charged for, but

nothing was charged for small bundles; the captain of the *Sun* had *instructions not to carry money*, and to his knowledge he never did carry any except remittances from the president of the company at New-York, and from the agent at Albany; public notice of such instructions, however, was not given. The company did not receive pay for packages of money, or other packages carried in the captain's office. It was proved that it had been and was the practice of the masters of steam-boats to carry bundles of money, for which they received compensation, and that the regular price of carrying *specie* was fifty cents per box. In November, 1826, a package of bank bills, containing \$14,347 $\frac{5\,0}{1\,0\,0}$, and a draft for \$1800 were put up by S. & M. Allen in New-York, to be sent to a bank in Albany; it was delivered to the captain of the *Sun*, who engaged to take charge of it, he being told it was very valuable. In consequence of some disturbance on board the *Sun*, she did not leave for Albany on the day the package was delivered to the captain, and the letters and packages which had been put on board of her were transferred by him to another steam-boat, not belonging to the company, which left that day for Albany. The bank bills were not received in Albany. The delivery of the package to the captain of the Sun was proved by two witnesses; he however denied all knowledge of it, as did also the captain of the other boat. As to the compensation for carrying money in steam-boats, it appeared that for the transportation of *specie* a fixed price was paid, which was accounted for to the owners; but for the carriage of packages of *bank bills*, a compensation, either by the parcel or for the season, was made to the captains of the boats, who considered it a perquisite, and rendered no account thereof to the owners. The Messrs. Allens were in the habit of transmitting packages of money by the steam-boats, and of paying the captains for carrying the same.

On the trial of the cause, after the plaintiffs had closed their proofs, the defendants' counsel moved for a nonsuit, on the grounds, 1. That the action could not be maintained as brought against the defendants; that it should have been against the *corporation*, or against *all* the stockholders, or

against the stockholders *severally* ; 2. That bank notes and drafts were not goods, wares or merchandise within the meaning of the act incorporating the company ; 3. That the master of the steam-boat was not the agent of the company for the carriage of bank bills, or to make contracts in relation thereto ; 4. That in receiving the bills, the master acted not as the *agent* of the company, but in his own right and on his own responsibility, and he, and not the company, was liable ; and 5. That there was no payment or tender of payment for the carriage of the bills, nor was there any agreement, either express or implied, in relation to compensation. The presiding judge refused to nonsuit the plaintiffs, but reserved the questions for the decision of the supreme court. The plaintiffs waived their right to recover for the draft of $1800, and a verdict was taken for the plaintiffs for upwards of $15,000, subject to the opinion of the supreme court upon the questions reserved, set forth in a case, with leave to either party to turn the same into a bill of exceptions. The supreme court gave judgment for the plaintiffs. See 2 *Wendell*, 327. The defendants turned the case into a bill of exceptions, presenting the above questions and the decision thereon against them by the circuit judge, as also the charge of the judge to the jury, that on the evidence given, the plaintiffs were entitled to a verdict. The defendants sued out a writ of error.

*D. Lord, jun.* for plaintiffs in error. At common law the defendants are not liable. The action, if maintainable, is so by virtue of the act of incorporation, which subjects the stockholders of the company *individually* to an action in the same manner as carriers at common law are liable. By the terms of the act a suit may be brought against each stockholder *severally*, but a *joint* action is not given against *all*, much less against a number more than one, and less than all. It is not a joint *and* separate liability ; had such been the intent of the legislature, it would have been so declared, as was done in acts incorporating *Coal* and *Iron-works* Companies, *Laws of* 1826, *p.* 272, 3 *and* 314, 17, where it is declared that any person having a demand against the compa-

nies may sue any stockholder *singly*, or any *two or more* stockholders *jointly*. If all the stockholders are liable, all should be joined, so that each may be compelled to contribute. The action being *case*, the non-joinder of parties could not be pleaded.

*Bank bills* are not *goods*, *wares* or *merchandise*, within the meaning of the statute. The words in the statute are used in reference to a company whose business was to be the navigation of the Hudson river by boats propelled by steam, engaged in the transportation of articles of merchandise, of bulk, weight and identity. The technical terms *goods and chattels*, are not used, and it is manifest from various concurrent acts, that the legislature by the use of the terms goods, wares and merchandise, did not mean to include every thing coming under the generic terms, goods and chattels; thus in various acts of the same session of the legislature incorporating *Insurance companies*, *Lombard companies*, *Loan companies* and *banks*, the companies are prohibited from employing any part of the *stock*, *funds* or *monies* thereof in buying or selling any *goods*, *wares* or *merchandise;* thus distinguishing between *stock*, *funds* and *monies*, and *goods*. *Laws of* 1825, *pages* 18, 24, 37, 43, 48, 61, 67, 184, 191, 198, 214 *and* 246. Goods and chattels are not synonimous with personal property; and under the description of goods and chattels, bank notes are not included. 1 *Dowl. & Ry.* 287. 1 *Carr. & Payne*, 310, 454. An insurance on *goods* will not cover bank bills. *Manning's Dig. tit. Insurance B*, 5. *Phil. on Ins.* 66.

The master of the steam-boat was not the *agent* of the company for the carriage of bank bills, or for making contracts in relation to such business. No express authority to the master is shewn, and none can be implied from the circumstances of the case. It does not result from his employment; he cannot be regarded as the master of a general ship, his character more nearly resembles that of the driver of a carriage. The boat was fitted up for the conveyance of passengers, and not for the carriage of bank bills. The master had no authority to carry bank bills, unless it may be implied from usage. Usage, however, does not help the plaintiffs, for it proves that the contract was with the master, and not

with the owners of the boats. The usage was to trust the masters, and the plaintiffs are bound by it. *Douglass*, 510. Special notice that the master was instructed not to carry money was not necessary. The master of the Sun was not bound, either as a faithful agent of his employers, or as a common carrier to carry money; he was not selected with reference to such business. From the very nature of the case the trust is personal. Who would think of subjecting the owners of a ship to an action for the loss of ship letters containing money.

There can be no recovery, for the want of notice of the value of the bills; it was not enough to say that the packet was valuable. The master should have been furnished with the means of judging of the degree of care necessary for its safe keeping, and to enable him to fix a compensation for the risk. Concealment is equivalent to a false representation; if with a knowledge of the facts the master would not have taken charge of the packet, the plaintiffs having omitted to disclose them, the defendants are not liable. *Phil. on Ins.* 80.

*B. F. Butler*, on the same side, to shew that the words *goods, wares and merchandise*, when used by the legislature, are used in their popular sense, referred to 2 *Revised Laws* 181, 193, 228 *and* 529; and that the legislature do not consider *money* as included under the general description of *goods and chattels*, he cited *Revised Laws, vol.* 1, *pages* 223, § 4, 7; 405, § 2, 3; 410, 497, § 14, *and vol.* 2, *pages* 188, § 2; 191.

*H. Bleecker & S. A. Foot*, argued the cause for the defendants in error, the plaintiffs below; their arguments were substantially the same as urged by them in the supreme court, see 2 *Wendell*, 329, 330, 331, 336, 337; see also the opinion of the *Chief Justice*, on the decision of the case in the supreme court, 2 *Wendell*, 337, *to* 345, and the opinion of the *Chancellor, post*, going to shew that the defendants below should be held responsible for the loss of the bank bills.

*S. A. Talcott*, in reply. The plaintiffs below ought first to have sought their redress against the *corporation*. The ob-

ject of the act in the provision relied on by the plaintiffs, was not so much to regulate the *mode of suing*, as to secure the owners of property from ultimate loss by *imposing a personal responsibility* on the stockholders, in case the funds of the corporation should be insufficient to satisfy the demands against it. The general objects of the act were to encourage and facilitate transportation, and to ensure to the public eventual compensation for the losses incurred ; it should therefore be so construed as to effect as far as possible the intentions of the legislature ; it would be a harsh and unreasonable construction to expose stockholders to pay from their private funds, when the means of the company were ample, and within the reach of the creditor, and the effect would be to deter capitalists from becoming stockholders. The individual liability should not be held to extend farther than to make the stockholders personally responsible for all losses beyond the means of the corporation to pay. 3 *Conn. R.* 52.

If there is an immediate personal liability in the first instance, the action should have been brought either against a *single* stockholder, or *all* the stockholders jointly, and not against a portion of them. The *common law* liability and the *ordinary statute liability* was a *corporate liability* ; the act superadds a further, i. e. *a personal liability*, by declaring that the members of the corporation shall be liable *individually* as common carriers ; this liability is either distributive or conjunctive : if the first, *one* stockholder may be sued alone ; if the last, *all* must be joined in the action. Had the word *individually* been omitted, still a *personal* liability would have been imposed ; being inserted, effect must be given to it. A statute must be so construed, that if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant. 1 *Show.* 108. *Hard.* 344. The word 'individually' was inserted to relieve a plaintiff from the delay of a plea in abatement, or from being nonsuited on the trial for the nonjoinder of all the stockholders. The liability, therefore, is *several* and not *joint;* and if more are joined in the action than should be joined, advantage may be taken of the misjoinder under the general issue. If *joint*, it is a *statute liability,* and the plaintiffs must bring themselves strictly within

the act; they must sue all the members, and cannot select a part in a manner warranted neither by the common law nor by the statute. The plaintiffs might have sued the cor= poration as in ordinary cases; having resorted to the stat= ute remedy, they were bound to bring themselves strictly within it. A statute which gives a new remedy, unknown to the common law, is not to have a liberal construction to extend the remedy. 1 *Sid.* 63. *Viner's Abr. tit. Statute,* E. 6.

The rule of the common law in relation to common car= riers, has been called a "rigid rule," a 'rigorous law,' 6 *Johns. Rep.* 164; 12 *id.* 132; see also 2 *Nott & McCord,* 89; and courts should pause in the extension of it to a doubtful case. The *bank bills* in this case are not inclu= ded in the description of *goods, wares and merchandise.* They are not *wares* or *merchandise;* if they come within the act, it must be under the term *goods,* which, under cer= tain circumstances, may include bank bills, while in others it will not. The meaning of words varies with circum= stances, and for their true interpretation, regard must be had to the nature of the subject in reference to which they are used, the object in view, other words in connection, other parts of the same act or instrument; and, in fine, to all the circumstances of the case. Thus, in a bequest by a man of *all* his goods and chattels, (*all* his wordly estate,) the *intent* of the testator being not to die intestate, bank notes, money and choses in action will pass. So, under the bankrupt law and the statute of frauds, the *policy* of the statutes will gov= ern. *Ambl.* 68, 69. 1 *Ves. sen.* 273. *Reports temp. Hardw.* 52, 53. 1 *East's Cr. L.* 748. 13 *Johns. R.* 88. These ca= ses shew that the general and comprehensive words *goods and chattels* do not *of course* include money and bank notes, and only include them when it appears to be the *intent* that they should be included. What was the *intent* of the legislature in the present case? The avowed object of the act was to incorporate a company, whose business should be confined to purposes connected with *the navigation of the Hudson river by steam-boats,* and the declared intent was the *transportation of goods, wares and merchandise,* requiring the size and accom=

modation of *steam-boats* for their stowage and conveyance. The *transportion of bank bills* could not have been one of the purposes of the incorporation, and of course the transportation of bank bills was not contemplated as constituting any part of the ordinary business of the corporation; it was not for such purpose that the legislature could have considered it useful to incorporate a steam-boat company for the *navigation of the Hudson*.

Again; had the words *goods and chattels* been used in the act, there would have been some ground for argument on the other side; but even then, the reason of the thing, and the main object of the legislature would have been opposed to the construction on the other side. No maxim is better established than that of *noscitur a sociis*, applied as well to the interpretation of words as the character of individuals. The legislature, instead of using the *legal* phrase, 'goods and chattels,' adopt the *mercantile* phrase, 'goods, wares and merchandise.' In a sale of all the goods, wares and merchandise in a store, would *bank notes* in the drawer of the merchant pass? Under a count for goods, wares and merchandise sold, could there be a recovery for bank notes sold? The counsel here adverted to a number of cases as to the construction given to testamentary bequests; 11 *Vesey*, 666; 1 *P. Wms.* 67, 112; 3 *Atk.* 62; 3 *Bro. C. C.* 311; *Preston on Legacies*, 169; 13 *Vesey*, 46; and to policies of insurance, 3 *Campb.* 422; 8 *East*, 375; *Park on Ins.* 25; *Manning's Dig. tit. Insurance*, B. (*a*), pl. 5; *Phil. on Ins.* 66; 1 *Carr. & Payne*, 310, 454; and contended that if the term *goods*, standing alone, would include bank bills, still, the terms *wares and merchandise* accompanying it, limited it to things *ejusdem generis*; but he denied that if the word *goods* stood *unrestricted* by the other terms used in the act, that it would include bank bills; the case under consideration not being like one arising under a will, or bankrupt law, or other statute, or disposition of property, intended to include *all* a man's property. Wherefore, from the nature of the business; from the use of similar words by the legislature in other cases; from accompanying words explanatory of the term *goods*; from the whole course of decisions applicable to the

case; and from the plain common sense view of the subject; he contended that goods, wares and merchandise, to be put on board a steam-boat for transportation, cannot mean a package of bank bills. Besides, he urged that the act may well be deemed to have been passed in reference to the *existing usage* of transportation on the river; for the transportation of *specie* a fixed price was paid, which was accounted for to the owners, but for the carriage of packages of *bank bills*, compensation was made to the masters of the boats, who considered it a perquisite, and rendered no account thereof to the owners; that the act was not intended to extend liability to cases beyond the usage, but merely to impose personal responsibility to that extent.

The master of the steam-boat was *not* the *agent* of the company for the carriage of parcels of *bank bills*, or for making contracts in relation to such business; he was their agent only for *sailing a boat* employed in the conveyance of *passengers*. Admitting, for the sake of argument, that the statute, by the term *goods*, would extend to include bank bills, and make the defendants common carriers as to such, if they had made it *their business* to carry bank bills; still they might *curtail* or *restrict* their business. By *usage* it was not their business, although they might make it so. The transportation of bank bills was no part of the business of *steam-boat owners;* when bills were transported, it was by the masters of the boats, for their own emolument. *Prima facie*, therefore, the owners were not carriers of bills. But if it were otherwise, they might *restrict* their business to the transportation of particular species of property, or *exclude* any particular species of property. Exclusion may result, *first*, from the nature of the business; as, the owner of a *stage coach* is not bound to carry a barrel of apples or a hogshead of molasses; nor are the owners of *steam-boat* obliged to carry a ton or two of gun-powder; nor the owners of a Liverpool packet, some twenty or thirty asses. *Second*, it may result from the expressed will of the carriers. A carrier has the right to say : If you send money, you do it at your own risk; the responsibility is too great for me, and I will not undertake it; 3 *Carr. & Payne*, 320; he may limit his business as he pleas-

es, 2 *Esp. Dig.* 250, 2. Here the defendants expressly for-
bade the master of their boat to carry money; and to his
knowledge he never did carry any, except for the agents of
the company. It was not necessary that notice of this pro-
hibition should be brought home to the plaintiffs; they were
bound to know the *general usage*; they in fact knew it, and
had no reason to suppose that the master of the boat was au-
thorized to contract beyond such usage; and, seeking to en-
force the contract made with him, it is incumbent on them
to prove his authority. This is not like the case of a party
who is a general carrier of *all* goods, and wishes to limit his
responsibility to a certain amount in value as to such goods,
which it is his *ordinary business to carry.* There is a mate-
rial distinction as to a notice merely limiting responsibility *as
to value,* and a determination limiting and restricting the bu-
siness of a carrier. In the one case, the presumption is that
the carrier transports *all* goods in the line of his business in
the common mode, subject to the common liability, and there
the *notice* must be brought home to the party; in the other,
the question is, *what is his ordinary business? what goods,* and
what kind of goods does he transport? A common carrier
does not become a common carrier of *every thing,* unless he
so chooses; for such goods as he carries in his ordinary bu-
siness, he is liable; the party employing knows that he may
confine his business to particular goods, and may exclude
others; he must see to it, therefore, when he delivers goods
to *an agent* who is only agent for the ordinary business of his
principal, that the goods are such as fall within that business,
otherwise the contract is not within the authority of the
agent, and the principal is not bound. 1 *East,* 604. The
authority of the agent may be tested by another principle.
Common carriers are bound to carry what is within the usual
course of their business, if they have conveniences for it. 2
*Kent's Comm.* 465. 5 *T. R.* 143. 4 *Barn. & Ald.* 32. Had
the master of the boat in this case refused to take the bills
to carry, would an action have lain against the owners?
What doubt can there be that such action could not have
been sustained? To render one liable as common carrier,
he must make the carriage of goods like those in question a

*common employment;* and he must do it for *hire.* 4 *Burr.* 2300, 2302. 5 *East,* 436. 1 *Salk.* 143. 5 *Mod.* 92. *Co. Litt.* 89, *a.* 8 *Johns. R.* 216. One employed *pro hac vice,* though for a reward, is not liable as a common carrier. 1 *Hayw.* 14. 1 *Wendell,* 272. The reward here, if any, belonged to the master, and he, if any one, is responsible. The owners could not have recovered for the freight of the money; the usage was that the compensation for carrying bills went to the masters of the boats; and the owners having expressly forbidden the carriage of money, it was not in their business that the compensation was earned. Evidence of the usage was properly received. In *Halsey* v. *Brown and others,* 3 *Day's R.* 646, in an action against the owners of a brig for a quantity of *gold* and *silver* delivered to the master of the vessel, to be transported from *Nevis* to *New-London,* proof was given that by a usage or custom of merchants of *Connecticut* and *New-York,* the freight of money received by the master of a vessel was his perquisite; that he was to be compensated for the transportation of it, and not the owners of the vessel; and that the contract was to be considered as being personal and of individual obligation, and not as the contract of the owners. The defendants had a verdict, and a new trial was refused; the court saying that the general commercial law may be, and in many instances is controlled by a special custom; so the general commercial law may, by the same reason, be controlled by a special local usage, so far as that usage extends, which will operate upon all contracts of this nature, made in view of, or with reference to such usage; which decision of the court of *Connecticut* was cited with approbation in the supreme court of the United States, in the case of *Renner* v. *Bank of Columbia,* 9 *Wheaton,* 590. The case of *Dwight* v. *Brewster and another,* 1 *Pick.* 50, which has been supposed fully to support the decision in the court below, is clearly distinguishable from the present. There the defendants were held liable for the loss of a package of money delivered to the *driver* of a *stage coach* for transmission; but it appeared that the driver, to whom the package was delivered, was one of the proprietors of the coach, and that the other defendant was *present* at the deliv-

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

ery of it to the driver. Both defendants, therefore, might well be deemed to have assented to the taking of the package for hire, and both were properly held liable.

The following opinions were delivered :

By the CHANCELLOR. The objections to the judgment of the court below are of two classes. The first relate to the form of the action, and to the individual liability of the stockholders; the second deny the liability of the stockholders, or of the company for the loss, in any way, or in any form of action.

By their act of incorporation, *Laws of* 1825, *p.* 336, the Dutchess and Orange Steam Boat Company are authorized to employ their capital for all objects connected with the navigation of the Hudson, by boats propelled by steam. They were therefore authorized to establish boats for the transportation of passengers, or of any thing which could possibly be the subject of transportation from one place to another, for hire or compensation. The 6th section of the act, under which this suit against the stockholders was brought, provides that the members of the corporation shall be liable individually, in the same manner as carriers at common law, for the transportation of all goods, wares and merchandise delivered to the agents of the corporation, and for all contracts made by such agents relating to the business of the corporation. Much time was spent on the argument in discussing the question whether a package of bank bills came within the description of goods, wares and merchandise, within the meaning of this section. Where words are sometimes used in different senses, their meaning in a statute must always be construed in reference to the subject matter of the enactment. For all civil purposes, and especially in the United States, where they constitute nearly the whole circulating medium of the country, bank bills are considered and treated as money ; and therefore come within the general term goods. And there can be no doubt that if a common carrier undertakes the transportation of packages of bank bills, for hire or reward, he will be liable to the same

extent as if he contracts in the same manner to carry Spanish milled dollars, or any article of merchandise. Whatever the corporation undertakes to transport is unquestionably within the protection of this clause of the act, provided a carrier of the same articles would have been liable at common law under like circumstances.

The liability of the stockholders in this case however does not alone depend upon the meaning of the terms " goods, wares and merchandise" in the act of incorporation. If these words had been left out of the statute, the stockholders would still be subjected to the same liability under the other provision of the same section, which makes them liable in the same manner and to the same extent for all contracts made by their agents relating to the business of the corporation. The legislature did not intend to restrict the liability of the stockholders to contracts for the transportation of goods. As the corporation are authorized also by their charter to employ their capital in the transportation of passengers by steamboats, the legislature evidently intended to extend the liability of the stockholders to contracts of that nature also. And so far as the carriers of passengers and their baggage are liable at common law, for any neglect or misconduct of themselves and their servants in the discharge of that duty, the stockholders of this company are individually and personally liable to the same extent. The counsel for the plaintiffs in error seemed to suppose there was something special in the form of the remedy given by the act of incorporation against the stockholders; and that the suit must be brought against all of them jointly, or each of them separately, as upon a joint contract before the passing of the act for the amendment of the law. The word " individually" in the sixth section of the act relates to the personal liability of the members of the corporation, as contradistinguished from their liability in their corporate capacity. Every person who has a claim against the company, as carriers of perons or goods, in consequence of any express or implied contract of their agents, may therefore, at his election, bring an action either against the corporation, or against the individual stockholders as if they were not incorporated. The legislature has, in the act of

incorporation, only given the right; they never intended to prescribe the remedy; but have left the party having such right to draw his remedy from the ample stores of the common law, modified as it has been by legislative enactments. If he proceeds against the corporate funds to obtain satisfaction of his claim, he must proceed according to the existing laws; and is entitled to all the facilities afforded by modern legislation to render his proceedings against them expedient and effectual. If he proceeds against the stockholders personally, he must proceed according to the present laws, and the existing practice of the courts, to obtain satisfaction from their private funds. If he sues them as joint contractors, and by a suit in form *ex contractu*, he must sue all who are jointly liable, or those who are sued may plead the non-joinder in abatement; but they cannot take advantage of the objection in any other way. Such being the law, it is unnecessary in this case to discuss the question whether joint carriers must be proceeded against jointly in an action on the custom, or whether they may be sued severally as in ordinary actions for tort, there being no plea in abatement here.

Neither is there any hardship in this mode of proceeding. The legislature had a right to grant to this company a part of the privileges only which are granted to ordinary corporations. Under this charter the stockholders have, as between themselves, all the benefits of a corporation; and they may even sue and enforce their own rights against others in their corporate name. But so far as respects their liability to others, the legislature did not think the object of the association of sufficient public importance to justify them in exempting the stockholders from the individual responsibility to which the members of all unincorporated joint stock companies are subjected. If the same course had been adopted in relation to a hundred other incorporations of a similar character, which are not of any particular benefit to the public, no injustice would have been done; and individual enterprise would have had a better chance for fair competition. Those who voluntarily become stockholders of such a corporation have no right to complain that still greater privileges have

not been granted. If any one is compelled to pay more than his share of the company debts, and the corporate fund is not sufficient for his indemnity, the other stockholders must contribute in proportion to their interest in the concern, in the same manner as other joint partners, or, tenants in common of a vessel. I have therefore no doubt that if the plaintiffs below had any right of action, the defendants were personally liable; and that there is no valid objection to the form in which the action was brought. I shall therefore proceed to the examination of the second class of objections, which go to deny the right of the plaintiffs to recover against the stockholders or the company in any form of action.

The carrier is liable in respect to his reward; and he actually does, or has a right, to charge enough to compensate him for the transportation of the goods, and for the extraordinary vigilance which is necessary on his part to protect them from damage or loss. If, therefore, the contents and value of a package is improperly or fraudulently concealed from him for the purpose of depriving him of a part of the compensation he would otherwise have claimed for the transportation and risk, he is not liable, if he uses the ordinary vigilance which a prudent man would exercise in the preservation of his own property of the same apparent value; but if no improper means are adopted to conceal the contents of the package or its value, the party delivering it to the carrier is not bound to inform him of the contents or value thereof, when no enquiries are made of him on the subject. *Philips* v. *Earle*, 8 *Pick. Rep.* 182. 2 *Kent's Com.* 468. *Jeremy's Law of Carriers*, 34. In this case there was sufficient information as to the contents of the package at the time it was received by the master of the Sun. He was informed it came from the Messrs. Allens; it was directed to Mr. Olcott at Albany, as cashier of a bank; it was done up in such a manner as to have the appearance of a very large sum in bank bills; and he was expressly told it was a very valuable package. Under such circumstances, no one can doubt that the master of the boat believed it to be a package of money, and received it as such.

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

It is not necessary that there should be any express agree-ment for compensation to authorize a carrier to charge and recover the same, or to make him liable for the loss of the goods entrusted to his care. If he is in the habit of transport-ing goods for hire, the agreement to pay the usual price, or what the transportation and risk are reasonably worth, if no specific charge for such articles had been adopted, is implied from the delivery to the carrier for transportation. And if the carrier or his agent receives the goods under such circumstan-ces, he becomes legally liable for their safety as well as their carriage. Neither is it material that the goods should be pre-cisely of the same kind and description that had before been carried for hire, to make the carrier liable for a delivery to his agent, provided they are such that the person delivering them has reason to suppose they are fairly within the ordinary scope of the agent's authority to receive and transport. Thus it is every day's practice for ship masters and other agents to receive and transport new kinds of goods, which were be-fore unknown, and yet no one ever doubted that the ship owner was equally liable as if he had been personally pre-sent and agreed to transport the new article. And he is equally entitled to compensation for the freight. But the owner of a passage boat carrying light freight might not be answerable for a cargo of coal or of marble, taken on board by the master, although he had been in the habit of carrying small pieces or specimens of either for hire. In the last case, the party who contracted with the agent would have good reason for presuming that the agent was acting contrary to the wishes of his principal; and if such was really the fact the latter would not be liable.

It appears by the evidence in this case, that it was a gene-ral practice with the masters of passage boats to receive com-pensation for the transportation of bills and specie. And the owners of the Sun were in the habit of receiving compen-sation for light articles carried on board that boat. This package being delivered to the master under these circum-stances, if it had been transported and delivered as directed, the Allens would have been legally liable for the usual com-pensation, although there was no special agreement to that

effect. It is true that as to some of the boats it was a per-quisite of the master, who received the pay for packages of bills by the consent of the owners of those boats. As the Allens knew of that arrangement, as to some of them, if it had appeared that the master of the Sun was entitled to the same privilege, perhaps notice of the fact might have been implied. In that case the question, which appears not to have been fully settled, whether it is only a mode of compensating the master by the owners, so as to leave them still liable to the shipper, would have been fairly raised. But that question cannot arise on the facts given in evidence on this trial. Here the master had no such privilege; and the plaintiffs cannot be chargeable with implied notice of a fact which did not exist. Even if they had supposed the master entitled to the privilege, and had contracted with him expressly on that footing, the owners would have been entitled to pay for the transportation of the package, and the risk. Freight, *prima facie*, belongs to the owner, and not to the master; and every article put on board is of right subjected to the payment thereof. The shipper who deals with the master on account of his privilege is not excused from liability to the owner if no such privilege exists. *Valin's Com. on the Ord. of Louis XIV. title,* " *Of the Hiring and Wages of Seamen,*" *art.* 2, *Jour. of Jurisprudence,* 277, 281, 284. The president of the company testified that the master had instructions not to take money to be transported on board of the boat; he therefore had no privilege. But if in disobedience of his instructions he did carry it, the owners were entitled to the freight. If the Allens had known of this prohibition, the company would not have been liable; it appears however no public notice was given, and there is no reason to believe it was known or even suspected by the plaintiffs; the master of a general ship, or of one who is in the habit of carrying frieght or pas-sengers for hire or reward, for the benefit of the owners, is their general agent as to the usual employment of the ship. And if he receives goods or passengers on board for freight or transportation, although contrary to the express directions of his owners, they are liable for his contracts, unless the oth-er party knew or had reason to believe he was exceeding his

powers. *2 Kent's Com.* 484. *Domat, b.* 1, *tit.* 16, § 3, *art.* 2. Here was a general ship authorized to carry passengers and light freight, for hire, and without any notice to the public that any particular articles, or kind of light freight was excepted. This package was delivered to the master on a contract to transport it to Albany and deliver it as directed. The owners had a right to affirm the act of the master and compel the Allens to pay a reasonable compensation for the trouble and risk, if the contract had been performed; and I think according to the settled principles of law they are answerable for the loss. If they have employed an agent who has subjected them to a risk they did not wish to assume by disobeying their instructions and withholding the knowledge of that fact from others, it is their misfortune; but not the fault of the plaintiffs whose money has been lost through the palpable negligence of some of their agents or servants on board the boat.

The rule of the common law has sometimes been complained of as unnecessarily rigorous and harsh. It is only considered so in those cases where the carrier is subjected to loss, although he shows conclusively that the damage was sustained without any possible fault or negligence on his part, or on the part of his agents or servants; as where the goods were destroyed by an accidental fire which consumed the building where they had been properly deposited for . safe keeping for the night; or where they were taken from his possession by a band of robbers, or other superior and irresistible force. But if the carrier were only answerable for *culpa levis*, which is the contrary of that ordinary care and diligence which a prudent man makes use of for the preservation of his own property, the defendants did not show sufficient in this cause to excuse them from liability. Here must have been great carelessness or inattention to the preservation of this package, by the master or some of the servants employed by the company on board of the Sun. The captain received a package containing about $16,000, which, from its size and the information given him by the clerk, he must have supposed to contain a very large sum of money, which he promised to take charge of and deliver, as direct-

ed on the arrival of the boat at Albany. And although it was ascertained within half an hour afterwards that the Sun would not go up that evening, no care was taken to send on the package by the master of the Richmond, or to return it to the owners. If it was sent on board the Richmond it was gross negligence not to have seen it safely delivered at the captain's office ; and it was still greater carelessness to leave it on board the Sun, where it appears there was more than one key to the drawer in which it was placed. No attention whatever appears to have been paid to it, except by the person who purloined it, until three days afterwards, when the owners came to search for their property. And even then the door of the office was not found to have been forced, nor the locks of the drawers to have been broken. The inference to me appears irresistible that the money was lost through sheer carelessness. Whatever, therefore, we may think of the rule of the common law, this is a case where the carrier would be clearly liable by the laws of Scotland, France, Spain, Holland, Italy, and our sister state of Louisiana, where the somewhat milder features of the civil law form the basis of the liability of carriers by land and by water. *For the law of those countries see the authorities cited in* 11 *Martin's R.* 314 ; *in* 10 *Johns. R.* 9 ; *see also the Napoleon Code, art.* 1782, 1784, 1952 *and* 1953. Even by their laws *culpa levissima,* or the slightest fault on the part of the carrier or his servants makes him liable for the loss or injury. And masters of ships and their owners, innkeepers and common carriers are answerable, not only for their own faults, but even for the least neglect of themselves or their servants ; and are only excused from losses which may happen by such accidents as the greatest care could not have prevented. These principles, engrafted into the laws of all civilized nations, and into the laws of some that are semi-barbarous, must be founded in natural justice—upon the absolute necessity of holding carriers and their agents to the most rigid rules, to protect the rights of those whose property is entrusted to their care. And from the discussions in the Napoleon Code it appears that the articles which relate to this subject were retained there by the enlightened council, to whose exami-

nation every part of the code was subjected, upon full consideration. And so far at least as our law requires of carriers, innkeepers, and owners of stages and steam-boats, that to protect themselves from liability for injury to the persons or property of others, they should show that the loss or injury happened from an accident or misfortune, which no reasonable exercise of care, skill or vigilance on their part or on the part of their agents or servants could have prevented, I have no wish to see it altered.

Without taking up the time of this court with a review of all the cases referred to by the counsel in their very elaborate argument of this cause here, or in the able and satisfactory opinion delivered by the chief justice in the court below, I have arrived at the conclusion that this suit was properly instituted against the defendants below, in their individual or personal capacity ; and that the plaintiffs were entitled to a verdict against them as common carriers, upon the facts proved at the trial. The judgment should therefore be affirmed.

By Mr. Senator McLEAN. In the case under consideration the defendants in the court below were, by that tribunal, adjudged liable, as common carriers, for the amount of the package of bills delivered on the 15th day of November, 1826, to Robert G. Livingston, as their agent for the purpose, at that time captain of the steam-boat *Sun ;* and being dissatisfied with the judgment of that court, they have brought it here for the revision and correction of this court, should that dissatisfaction, upon an examination of the case, turn out to be well founded.

The argument, I confess, left an impression on my mind, against the judgment of the supreme court, which subsequent reflection and examination has tended to strengthen.

The principal question, and the one involving the merits of the controversy is, were the owners of the steam-boat Sun common carriers of *bank bills* ? To establish that fact, the defendants here, the plaintiffs in the court below, resort to the act of incorporation, to show that the words, " *goods, wares and merchandise,*" used therein comprehend the sub-

ject in dispute. There can be no doubt that bank bills, under certain circumstances, and for certain purposes, are considered and treated as *goods ;* they are for wise and beneficial objects, subject to execution ; they also pass as goods to executors and administrators, and to the assignees of bankrupts; and I think there can be as little doubt, that under other circumstances, they are not comprehended in, or indicated by the word *goods.* No one would think of giving in evidence under a declaration for goods, wares and merchandise sold, bank bills ; or of demanding them on a promissory note, payable in those articles. And it would be hardly less unreasonable to suppose, that the legislature, in passing the act incorporating the Dutchess and Orange Steam-Boat Company, for the transportation of goods, wares and merchandise, used the word *goods* in so comprehensive a sense as to include *bank bills.* If any importance is to be given to the sense in which the legislature used that word, we are to take it in its ordinary acceptation. Most certainly, in common parlance, *goods* do not mean *bank bills;* but suppose they do, that circumstances, in my view, falls short of establishing the fact. It by no means follows that the company became common carriers of *all things* of which they might by their act of incorporation or otherwise have become common carriers. A common carrier may limit his business as he pleases, 2 *Esp. Dig.* 250, 2. Their character then, in this particular, must be made out by different proof; it must depend, after all, on their own usage, or the usage of other boats under similar circumstances.

There *is* no doubt that a person may become a common carrier of bank bills; but I believe it will not be pretended that it is the ordinary business of such employment. In an action, therefore, charging a person as common carrier thereof, the fact should be made out affirmatively, or otherwise, clearly and distinctly ; he should be brought definitively within the operation of a harsh and rigid principle of law, rather than that principle should be allowed to possess the pupillary power of dilating itself to reach a case of doubtful character. How then stands this case ? The defendants in the court below were owners of the Sun. Livingston, to whom the

bills were delivered on board that boat, was the captain thereof; and that they have not reached their destination is without doubt. Still, the mind is reluctant to charge the proprietors with the liability, upon the vague and uncertain presumptions arising from any construction of their act of incorporation, or from the fact that they might have become common carriers of bank bills. In my view all doubt is removed by the strong light reflected on the point by the testimony of the witness in the case. It is in evidence that the agent was instructed by his principals not to carry money, and that he knowingly never did so. It is also in proof, in relation to the custom, that specie is carried on freight received by the owners of the boats, and that bank bills are carried by the captains, and the compensation therefore is a personal perquisite; leaving the case, in my estimation, a clear one of personal confidence and trust reposed in the captains.

If any thing is wanting to support this conclusion, it is found in the further fact, that after it was ascertained that neither the Constellation nor Constitution was going out, in whose captains it appears this confidence had been reposed, Mendell, the clerk of the Messers. Allens, in his inquiries of Currie about the fitness of sending the package by Captain Livingston, was actuated by a desire to know his personal responsibility; and being satisfied on that point, unhesitatingly committed the package to his charge. In addition to this, is the expression by the commercial community, of their understanding of this usage, in their release of the owners, captain, and all hands on board, from similar liability.

Having come to the conclusion that the judgment of the court below is wrong on the merits, and ought for that reason to be reversed, I have not examined the other objections raised on the argument.

By Mr. Senator OLIVER. It was well said, upon the argument, that this was an important case, not so much on account of the amount in controversy as the extent of the principle to be settled. It is manifest that the legislature, by the act of incorporation in this case, intended to secure the public from ultimate loss, by imposing a personal liability on the

stockholders of the company, in addition to the ability of the corporation. The remedy against the corporation in the first instance is clear, and the personal liability of the stockholders is afterwards superadded for the more perfect security of owners or senders of goods. This being an incorporation for public accommodation, and to facilitate navigation, trade and commerce, should be liberally construed, so as to encourage such undertakings without impairing the security of the public.

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

It was urged on the argument, and that too with ability, that upon a fair common sense interpretation of the act, considering it with reference to the object which the legislature must have had in view, the party claiming redress should first seek it against the corporation; and that the individual liability imposed, was meant to extend no further than to make the stockholders personally responsible to make good all losses beyond the means of the corporation to pay. I confess this does not appear to me to be the fair exposition of the act; the suing of the corporation is not by the act made a condition precedent to the bringing a suit against the stockholders individually; they, as corporators, are subject to all the requirements of the act, and are personally liable in the first instance.

The legislature having superadded a further liability in the case now before us, we are to look to the act for the purpose of ascertaining what that liability is. The act says: "The members of the corporation shall be liable individually as common carriers," &c. I apprehend the supreme court were right in supposing this individual liability was in contradistinction to corporate liability, and that one or all must be sued; but the court say the non-joinder of all the defendants can only be taken advantage of by a plea in abatement. If it be considered, then, as imposing a joint liability by reason of the statute, should not the party insisting upon it, bring himself strictly within the statute? If this be considered an action upon the statute, and not at common law, the supreme court were under a misapprehension in applying the common law doctrine to the mode of rendering them liable. It only applies to the extent of their liability—to cases in which common carriers would be responsible at common law; and

not to designate the common law mode of enforcing their liability. Is it not just to say, when a party seeks to enforce a new and rather novel remedy given to him by statute, that he should bring himself strictly within its provisions? and when he fails to do so, is not his foundation gone, and should it not be available under the general issue? But as this is a new question, and its determination not necessary to a just and equitable decision of the cause, I proceed to give my views upon what appears to me to be the true point in the case; and that is, whether Capt. Livingston, in the receipt of the package, was acting in the capacity of agent of the company, and within the legitimate scope of his authority as such agent. To the proper solution of this question, it is necessary that we consider, 1. The conduct and conversation of the person delivering the package, and see how he understood the matter; whether he thought he was delivering the package to an agent of the company as such, whereby the company would be subject to the risk, or to an individual whom, from his situation and from information, he supposed trustworthy; 2. The conduct and conversation of Capt. Livingston, that we may see in what light he considered the transaction; and 3. Whether, if Capt. Livingston did receive the package as agent, he was acting in execution of the authority given him by the proprietors; or had the plaintiffs or their clerk good reason to think he was acting as such agent. As to the first point: It appears, from the testimony, that the direction given to Mendell was to send the package by Capt. Wiswall of the *Constitution;* and this probably not because he was an agent of the company, but because he had frequently been entrusted by the plaintiffs with large sums of money, and had been found worthy of confidence. The *Constitution* not sailing, Mendell went to look for some other person by whom he might safely send the money; and learning that Capt. Livingston was about sailing for Albany, he concluded to give it to him. Mendell swears that he inquired of James Currie, jun. as to the propriety of sending the package by Capt. Livingston; he also swears that he considered it prudent to send the package by a steam-boat captain. If he supposed that the captain received the money as agent,

and that the company would be responsible for its loss, why make the inquiry of Currie? or why raise in his own mind the question of the prudence of entrusting it to a steam-boat captain? He certainly knew that the company were perfectly responsible, and no question of the propriety or prudence of entrusting it to the company could arise in his mind. It appears manifest to me that Mendell gave the package to Capt. Livingston as an individual upon whom he could rely, and that if, previous to the delivery to Capt. Livingston, Mendell had found any other person going to Albany, whom, from personal acquaintance, from information, or from his situation and standing in society, he had good reason to believe trustworthy, he would without hesitation have sent the package by him.

As to the second point: It appears, both from the conduct of Capt. Livingston upon the receipt of the package and from his testimony, that he did not consider himself as acting as the agent of the company when the package was delivered. The question put to him was, will *you* take charge of the package? the same which would have been put to any individual. Nothing was said, either by the captain or Mendell, as to payment or any compensation for the carriage or the risk to be incurred ; and it cannot admit of a doubt that in order to make the company liable, there must have been a *quid pro quo*—something paid or agreed to be paid, as a compensation for the freight and the risk, upon the receipt of the package. It appears the captain acted as any other individual would have done under like circumstances; he did not demand any pay ; said he would take charge of the package and deliver it ; took it into his office and locked it in his private drawer ; no bill of freight was made out, nor was it entered on the books. From the testimony of Livingston, it appears that he considered the carriage of money as a matter between himself and the person entrusting it to him, and with which, either as it regards the compensation or the risk, the company had nothing to do.

In order to make the company liable for the loss of the package, it is clear that it should be established that both Mendell and Livingston understood that such was the condi-

tion upon which the package was delivered, or that from the conduct of the company or their agent, Mendell had good reason to suppose that was the condition. As to the first part of this last proposition, to me it appears plain that neither Mendell nor Livingston supposed that in the receipt of the package the latter was acting as the agent of the company; as to the second part, its discussion properly belongs to the third point which I have above stated.

As to the third point: The testimony shews that if Livingston did receive the money as agent, he was not acting in execution of his authority; indeed, he was expressly forbidden to take money. Yet this will not avail the defendants, (there being no public notice to that effect,) if, from the conduct of the proprietors or their agents, the plaintiffs or the public had good reason to suppose that in the carriage of money Livingston acted as their agent. There certainly was nothing in the conduct of Livingston himself calculated to produce this impression; he never carried money except for the agents of the company; his boat, the Sun, was not advertised for freight, and never carried freight except as a matter of favor; he did not demand any compensation for his trouble and risk, but acted in relation to the whole matter precisely as any other individual would who considered that he was barely doing another a favor. It also appears that it was the usual custom, not only with the captains of the boats belonging to this company, but of the other boats on the river, to carry money and themselves receive the compensation, without rendering any account to the owners. The owners neither regulated the amount of freight to be charged, nor received it when paid. The transaction was in all cases a mere matter of arrangement between the person sending the money and the captain, with which the owners were in nowise concerned. The captains sometimes received more and sometimes less compensation, and sometimes none at all. Can it be supposed, under these circumstances, that the owners considered the compensation received by the captains as part pay for services rendered to the owners? As well might we say that, because a person happens to be a captain of a steam-boat, he shall be incapable of transacting any business

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

on his own private account. This doctrine has been long settled, as appears by *Halsey* v. *Brown*, 3 *Day's R*. 346 ; in which, in an action against the owners of a vessel for a quantity of gold and silver coin, taken by the master at *Nevis* on freight, evidence of a custom of merchants in Connecticut and New-York, that the freight of money received by the master is his perquisite, and that he is to be personally liable on the contract, and not the owners, was held to be admissible. In the case of *Renner* v. *The Bank of Columbia*, 9 *Wheaton*, 590, the supreme court of the United States recognize the authority of the above case, state it at length, and adopt its language ; and it appears not only that this custom was known to the public generally, but was particularly within the knowledge of the plaintiffs.

Take the cases pertinent and apply them to this cause, and I think it will plainly appear that the company are not liable. It is laid down by Lord Kenyon, in treating of the liability of a common carrier, that the question is, "whether at the time the accident happened the goods were in the custody of the defendants as *common carriers*." 5 *T. R*. 394. In *Esp. Dig.* 622, this rule is laid down : "A delivery to a carrier's servant is a delivery to himself, and shall charge him, but they must be goods such as it is the custom of the carrier to carry, not out of his line of business." Again, in 2 *Comyn on Contracts*, 320 : "Those who carry goods for hire are considered common carriers." In 1 *East*, 604 : "He must see to it when he delivers goods to an agent who is only agent for the ordinary business of the company, that the goods are such as fall within that business, otherwise they are not within the authority of the agent." Again, he is to carry for hire. In 4 *Burrows*, 2300 ; "His warranty and insurance is in respect of the reward he is to receive," per Lord *Mansfield*. Again, per *Aston*, J. in the same case : "The true principle of the carrier's liability is the reward." The legislature, in the incorporation of a steam-boat company to carry *goods, wares and merchandise*, cannot reasonably be considered to have contemplated the carriage of packages of

bank bills which a man may put into his pocket; because neither the bulk nor weight of such packages require the accommodation of a steam-boat; and of course are not objects of freight to sustain a steam-boat establishment. This was the understanding of all the owners of the boats; they refused to carry bills, and they were always handed to the captains, who received whatever compensation the senders pleased to give. From the hasty view which I have given this part of the case, how can it be brought within any of the foregoing rules? Was the package, for the loss of which this suit was brought, in the custody of the corporation as common carriers? Does it come under the description of goods, wares and merchandise, for the transportation of which the steamboat company was incorporated? Was the package, as described, one which fell within the scope of their customary business, which the captain of the steam-boat *Sun*, as their agent, was authorized to receive for transportation on their account? Is there any evidence that the corporation ever assumed to carry, or did carry such packages for hire? If not, how can they be made answerable for such a package delivered to one of their captains, when the carriage of it was not in the course of their business? According to the case in 1 *East*, 604, the Allens should have seen to it, that the delivery of the package was in the line of the business of the company as carriers, or they are not and ought not to be charged in this or any other action. Again; how does the attempt to charge the defendants below for the loss of the package in question, accord with the doctrine of Lord Mansfield, as laid down in the case cited from *Burrow*, that common carriers are *quasi* insurers to their employers, and that their insurance is in respect of the reward they are to receive? It is an established rule, in cases of insurance, to graduate the premium according to the amount insured; the insurer should know something of what he insures, or he cannot fix his premium. How was it here? The package was of a description which the plaintiffs in error never assumed to carry for hire; neither they nor their agent knew the value of the package; they could fix no premium for the insurance.

The carriage of money was not in the ordinary line of the business of the company, and this, as it regards all their boats, and particularly the *Sun*, which was not advertised as a freight boat : and besides, no compensation was paid, or agreed to be paid, for the carriage of the package. If then I am right in either of my positions, *first*, that the suit was not properly brought, or, *second*, that Livingston did not act in the capacity of agent, the decision of the supreme court ought to be reversed.

By Mr. Senator TALLMADGE. Without going into a minute review of the numerous authorities cited on the argument, I shall content myself with briefly presenting the result of my examination and reflection on this case.

The sixth section of the act incorporating the Dutchess and Orange steam-boat company declares, "that the members of said corporation shall be liable individually, in the same manner as carriers at common law, for the transportation of all goods, wares and merchandise, delivered to the agents of said corporation," &c. The object of the incorporation was to facilitate the transaction of their business ; and this clause of individual liability was intended to give to the community the additional responsibility of its members, instead of the sole responsibility of the company. The members are, therefore, individually liable, as carriers at common law, the same as if this act had not been passed.

The terms, " *goods, wares and merchandise*," may or may not include bank bills, according to the manner in which they are used, and in reference to the subject matter to which they are applied. This company, no doubt, *may make* themselves common carriers of bank bills; but it by no means follows that they are so, because the act of incorporation is broad enough to permit them to become so. Whenever, from the nature and course of their business, they undertake to be common carriers of them, then the corporation not only, but its members individually are liable, as such. The testimony shews conclusively to mind, that the company did not and never intended to become common carri-

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

ers of bank bills.  It was the general usage for the captains of steamboats to take them on their own account, and receive whatever compensation was allowed for carrying them. It was a matter of their own, with which the owners had nothing to do ; it was a personal trust.  It must have been so understood by the captains, and by those who entrusted such packages to them ; and none, probably, were better acquainted with this usage than the Allens themselves ; they being in the constant practice of sending in this manner, and of either paying nothing, or else such compensation as was agreed on between them and the captains, without any reference to the company.  It is the reward which makes the carrier, in the usual course of his employment, answerable, and that too is generally in proportion to the risk.  But the usage shews that the reward, whatever it might be, was received by the captains, and not by the owners.

I would, by no means, relax the rule of the common law, that the carrier is liable for all losses that do not fall within the excepted cases of the act of God or public enemies ; but before his liability can attach, it must appear that he is common carrier of the thing for the loss of which he is sought to be charged.  A common carrier is liable to an action, if he refuse, without just ground, to do what is required of him in the course of his employment, provided he has the requisite convenience to carry, and is offered a reasonable or customary price.  Suppose then Captain Livingston, as agent of the company, had refused to carry this package, although tendered the customary compensation, alleging that the owners were not common carriers of bank bills, can it for one moment be believed that the company would be liable for such refusal ?  If not, and to me it appears clear that they would not, then certainly they have not made themselves common carriers of bank bills, and the members of the corporation are not invidually liable.

My opinion is, that this action cannot be maintained, and that the judgment below ought to be reversed.

On the question being put, *Shall the judgment of the supreme court be reversed?* the members voted as follows :

ALBANY,
Dec. 1830.

Sewall
v.
Allen.

For *affirmance*—The CHANCELLOR, and Senators BEARDSLEY, BENTON, CONKLIN, McCARTY and REXFORD—6.

For *reversal*—Senators ALLEN, ARMSTRONG, BOUGHTON, DEITZ, GERE, HUBBARD, MATHER, McLEAN, OLIVER, SHERMAN, TALLMADGE, TODD, WARREN, WHEELER and WOODWARD—15.

Whereupon the judgment of the supreme court was *reversed.*