## Farmers' & Mechanics' Bank *v.* Champlain Transportation Company.

[Same case, 16 Vt. 52 ; 18 Vt. 131.]

*Common carriers. Construction of charter. Carriers of bank bills. Agency. Evidence. Limitation by notice. Termination of transit. Loss of paper. Weighing evidence.*

The defendants, a corporation, were common carriers upon Lake Champlain, and their charter extended to the carrying of all goods, wares and merchandize, and "all other articles and things usually transported by water" on that lake; and it appeared, that bank bills were usually carried by the water craft upon that lake, at the time the corporation received their charter and went into operation; and it was held, that the defendants' powers, as a corporation, extended to the carrying of bank bills, but that the charter did not of necessity constitute them common carriers of bank bills, so as to preclude them from the right of declining to assume the risk of carrying such articles, if they so elected.

And it is not necessary, in such case, to show, by positive proof, that the company consented, that the captain of their boat should carry money on their account, in order to hold the company responsible for the loss of the money. The captain of the boat is to be regarded as the general agent of the owners ; and *prima facie* the owners are liable for all contracts for carrying, made by the captain, or other general agent, for that purpose, within the powers of the owners themselves, and the burden rests upon them to show, that the plaintiffs had made a private contract with the captain, which it was understood should be kept from the knowledge of the defendants, or else had given credit exclusively to the captain.

The mere fact, in such case, that the captain was, by the company, permitted to take the perquisites for carrying such parcels, will not be sufficient to exonerate the company from liability. Their suffering him to continue to carry bank bills ought to be regarded as fixing their responsibility, and the allowing him to take the perquisites, as a mere arrangement among themselves.

But it is not competent for the plaintiff, in order to charge the company with the loss of a package of bank bills, to prove by his agent, who delivered the package to the captain of the boat, that he intended to intrust the money to the captain in his official capacity, and not in his private capacity,—without evidence that this was in some way made apparent at the time.

A common carrier may, by his express contract, limit his common law responsibility; but a mere general notice, when brought to the knowledge of the owner

Farmers' & Mechanics' Bank *v.* Champlain Trans. Co.

of the goods carried, will not have that effect, unless there is very clear proof, that the owner expressly assented to that, as forming the basis of the contract. But a carrier may, by general notice, brought to the knowledge of the owner of the goods, limit his responsibility for carrying certain commodities beyond the line of his general business, or he may make his responsibility depend upon certain reasonable conditions.

When a common carrier, by steam boat, or other vessel, in the due and common course of his business, delivers his goods, or parcels, into the custody of the wharfinger, upon the wharf, the transit is ended, and his responsibility as carrier ceases, unless he have, either expressly or by fair implication, undertaken to do something more;—and the question, as to the time and place, when the the duty of the carrier ends, is one of contract, to be determined by the jury from a consideration of all that was said by either party, at the time of the delivery and acceptance of the parcels by the carrier, the course of the business, the practice of the carrier, and all other attending circumstances, the same as any other contract, in order to determine the intention of the parties.

Upon the trial, in 1847, of an action against a common carrier, to recover the value of goods lost, the plaintiff offered in evidence a printed advertisement, issued by the defendants in 1839, a portion of which had been accidentally torn and lost; and it appearing that search had been made by the plaintiff at the places in the vicinity, at which copies of the advertisement had been posted by the defendants, for another copy, without success, it was held, that the part produced might be read in evidence, and parol evidence given as to the contents of the part which had been lost.

It is a rule of law, in weighing contradictory evidence, that, other things being equal, positive evidence preponderates over negative evidence; but the court, in directing the attention of the jury to this rule, should also direct their attention fully to the facts and circumstances in the case, which are important in determining its application.

TRESPASS ON THE CASE. It was alleged in the declaration, that the defendants were common carriers upon Lake Champlain, between Burlington and Plattsburg, N. Y., and received from the plaintiffs, at Burlington, a package of bank bills, to be carried to Plattsburgh and there delivered to Richard Yates, Esq., to whom it was directed, and that the package was never delivered as directed, but was lost through the negligence of the defendants. Plea, the general issue, and trial by jury, September Term, 1847,—BENNETT, J., presiding.

The defendants were a corporation chartered in 1826, and, imme-

diately after that time, accepted their charter and organized, and have since acted under it; and it was conceded, on trial, that they were, at the time of the loss of the package in question, the owners of all the steamboats navigating Lake Champlain; that a part of the boats were called the "line boats," and run through the lake, from Whitehall to St. Johns, and another, called the "Winooski," run daily as a ferry boat, from Burlington to St. Albans and back, touching at Port Kent and Plattsburgh, N. Y., except a short time in the spring and autumn, when, on account of the ice, she went no farther than Plattsburgh, and was employed in transporting passengers, and various kinds of freight, as is required on the lake; and that Capt. Phillips was the commander of the Winooski, under the defendants. It was conceded, that the defendants were common carriers of goods, wares and merchandize, but it was denied, that they were common carriers of bank bills.

It appeared, that on the fifth day of June, 1839, Martin A. Seymour, the teller in the plaintiffs' bank, delivered, in behalf of the bank, to Capt. Phillips, then in command of the Winooski, and on board of the boat, a package of bank bills on the Clinton County Bank at Plattsburgh, belonging to the plaintiff, containing $1109,00, directed to "Richard Yates, Esq., Cashier, Plattsburgh, New York," and that Capt. Phillips received the package for the purpose of transportation, and that Seymour, in behalf of the bank, upon the delivery of the package, paid to Phillips fifty cents, that being the sum claimed by him. It also appeared, that Capt. Phillips, on his way to St. Albans, on the same day in the forenoon, delivered the package of bills to A. D. Ladd, the wharfinger at Plattsburgh, and that Ladd placed it in an open desk in his counting room, from which it was stolen the same day; and that it was never delivered, by any one, to the bank, or its cashier, or other officer.

The plaintiffs claimed, that, when the package was delivered to Capt. Philips, there was a special contract to deliver it at the bank, at Plattsburg; and Seymour testified, that when he delivered the package to Phillips, he asked Phillips if he would take it, and that Phillips, after apparently looking at the superscription, replied "Yes;" and that he then asked Phillips, either, whether he would deliver it at the bank, or to Mr. Yates,—who was then cashier,—and that he nodded assent, and he thought also replied "Yes," in a low tone of

voice; and that he then asked Phillips, what was to pay, and he replied fifty cents,—which the witness paid, from the money of the plaintiffs, and left the wharf. The plaintiffs inquired of this witness, to whom he intended to give the credit, at the time he delivered the money, and he replied, that he intrusted the money with Capt. Phillips in his official capacity, and not in his private capacity ;—this was objected to by the defendants, but was admitted by the court.

The plaintiffs also offered in evidence a part of a hand bill, which, with other copies, was proved to have been issued in May, 1839, by the defendants, and immediately by them caused to be posted up at different places in Burlington ; to the admission of which the defendants objected ;—but it appearing, that the remaining part of the hand bill, from which this was cut, had been accidentally destroyed, or lost, and that search for another copy had been made, without success, at the different places in Burlington at which copies were originally posted, and that the witness, who testified to these facts, did not know of any place, where one could be found, the part produced was admitted and read in evidence,—and was in these words :— " The proprietors will not hold themselves accountable for baggage, ' merchandize, specie, bank bills, or for any description of property ' whatsoever, unless the same is delivered into the hands of the re- ' respective captains, or clerks, and a regular bill of lading executed ' therefor." It appeared, that the portion of the hand bill, which was lost, showed only the names of the boats, and the captains who commanded them, and the time of departure.

The defendants gave evidence tending to prove, that the captains of their steam boats, as well the line boats, as the ferry boats, had, since their act of incorporation, and until the time of the loss of the package in question, been in the habit of carrying packages of bank bills, as occasion required ; and that it had been the uniform, notorious and well established usage and course of business, for the captains, at those landings where the boats did not stop long enough to allow of a personal delivery to the consignee, to deliver the packages of bank bills to the different wharfingers at the landings, without giving notice to the consignee ; that the Clinton County Bank was about half a mile from the landing at Plattsburgh, and when the ferry boat ran through to St. Albans, she did not stop at Plattsburgh

usually only from five to fifteen minutes, and not long enough to allow of a person's going to the bank and returning; and that at this landing, when the boat ran through to St. Albans, the uniform course of business was, to deliver the packages of bank bills to the wharfinger, for him to deliver to the consignee, without the captain causing any notice to be given to the consignee of such delivery to the wharfinger. And the defendants' evidence tended to prove, that at this landing, when the boat ran no farther than Plattsburgh, and at other landings on the lake, where the boats stopped long enough to allow of a personal delivery to the consignee, the captains sometimes delivered the packages personally to the consignees, and at other times delivered them to the wharfingers, or sent them by other persons to the consignees; and that some of the packages of bills, which were carried by the captains of the boats, were consigned to the wharfingers, and that they had personal instructions, in some other cases, to deliver them to the wharfingers. It appeared from the evidence, that previous to the defendants' act of incorporation, as well as since, the craft that sailed the lake had been in the habit of transporting bank bills.

The defendants also gave in evidence the testimony of Capt. Phillips, who testified at the trial of this suit at the May Term, 1842, but had since deceased; and his testimony tended to prove, that the package in question was delivered to him by Seymour, a short time before the boat left the wharf, and that Seymour asked him if he would take it, and that he replied "Yes," and received it, and that he then said to Seymour, that the banks had been in the habit of paying him fifty cents, and that this was all that was said between them respecting the delivery of the package, and that he did not engage to nor tell Seymour that he would deliver the package at the bank, or to Yates, in any way whatever, or to that effect. The testimony of Phillips also tended to prove, that he had in a few previous instances received packages of bills from the plaintiffs, by the hand of C. F. Warner, the cashier, consigned to the Clinton County Bank; and that he had been in the habit of receiving on each of the several packages fifty cents; and that upon one of these occasions, about three weeks previous to the loss of the package in question, he told Warner, that his practice was, to leave the packages with the wharfinger, at the wharf;—and he testified, that he received the

fifty cents upon the package in question, as well as in the other cases, to his own private use, and had in no way, in any instance, accounted to the company therefor,—though he testified, that there had never been any agreement between him and the company respecting these perquisites, and that nothing had been said on the subject, except that in the year 1837, on one occasion, he told Dr. Peck, that he had been in the habit of appropriating the perquisites, which he had received on packages of money, to his own use; and it appeared, that at that time Dr. Peck was a director in the defendants' company, and also a director and president of the plaintiffs' bank, and that he was also, at the time of the loss of the package in question, a director and one of the prudential committee, or acting agents, in the defendants' company, and also a director and president of the plaintiffs' bank; and this was all the evidence given to show that either the plaintiffs, or the defendants, had any actual knowledge of the manner in which Phillips appropriated the perquisites received on the packages of bank bills. Phillips also testified, that in 1837 Dr. Peck was often sending packages of bills to Plattsburgh and Keeseville, and asked the witness two or three times, when he had packages of money, to whom he delivered them, and that the witness told him, to the wharfinger, and not at the bank.

The plaintiff gave evidence tending to prove, that there was no uniform, well settled and notorious usage, which prevailed at Plattsburgh, or at the other landing places on the lake, in regard to the delivery of packages of money to the wharfinger; and the cashier testified, that he had no knowledge, how the packages were delivered. The testimony tended to show, that captains of the defendants' boats, as well as captains of other craft which sailed the lake, had been, previous to and until the loss of the package in question, accustomed to deliver such packages, by themselves or agents, to the consignees, as in the case of other goods, and not to the wharfingers, and that the usage claimed to exist was interrupted, unknown, and not uniform at all the several landing places upon the lake.

It appeared, that the package in question was delivered by Capt. Phillips, on his way to St. Albans, to Ladd, to convey to the bank; and Ladd testified, that he and Capt. Phillips had been in the habit of exchanging favors, and that he received the package in question to carry to the bank, and that he neither had, nor expected, any

compensation from Phillips, or from any other person, for carrying this or other packages, except that Phillips had done and would do errands or favors for him, whenever he had occasion to ask him. Ladd also testified, that between three and four o'clock in the afternoon of the same day that the package was left with him, he was in the village of Plattsburgh and there saw Cady, cashier of the bank, and told him he had a package for the bank, and that if he would wait, he would ride down to the wharf and get it for him; and that he immediately rode down to the landing and found that the package was gone.

The plaintiffs' testimony also tended to prove, that Dr. Peck had no agency in managing the financial concerns of the bank, except as one of the directors, there being seven directors in all, and that the financial concerns of the bank, relative to the transmission of the funds of the bank, were committed to the cashier exclusively.

It also appeared, that soon after the loss of this package the defendants gave directions to the captains of their steam boats not to carry any more packages of bank bills,—since which time they have abstained from carrying them.

The court were requested to charge the jury, as follows. 1. That the defendants are not *prima facie* carriers of bank bills, and that in this case they can only be made so by their custom and usage in receiving and carrying them for hire; and that evidence of a custom to carry gratuitously will not make the defendants liable, but, if they are common carriers, and this parcel was delivered according to such usage and custom, the defendants are not liable. 2. That if the captain received the pay for carrying packages of bank bills, and all other similar packages, and the company had no interest in it, and that fact was known to Dr. Peck, the president of the bank, the defendants are not liable. 3. That if the captain undertook, in this instance, to carry and deliver contrary to the custom and usage of the company and their advertisements and beyond the wharf, the defendants cannot be bound by it. 4. That if the defendants are common carriers of bank bills, and the captain so received this package as to bind the defendants, the defendants were not bound to deliver to Yates, or at the bank; and that a delivery to the wharfinger, according to the general custom and usage, discharged the company; and that it is immaterial, whether the plaintiffs knew of such

usage, or not. 5. That the defendants were bound only to deliver according to their general custom and usage in the delivery of similar packages; and if the general custom and usage of the ferry boat and its officers was to deliver to the wharfinger at Plattsburgh, when the boat run from Burlington to St. Albans, and packages were not delivered at the bank, when the boat thus run, and this package was so delivered, the defendants are discharged, although there may have been an occasional exception by their delivering it to some safe person to carry.

But the court charged the jury, that although it was admitted, on the trial, that the defendants were common carriers of goods, wares and merchandize, yet that would not constitute them common carriers of bank bills,—for the reason that bank bills were not comprehended within the terms, *goods, wares and merchandize;*—but that, as the defendants had obtained an act of incorporation in 1826, by which they were constituted a corporation for the purpose of transporting upon Lake Champlain, not only goods, wares and merchandize, but all other articles and things usually transported by water on the lake, and had accepted this charter and ever since acted under it, and especially as it appeared, that the craft which sailed the lake, both previous to and since 1826, had been in the habit of transporting bank bills by water, the court had no doubt, that the defendants must be as much common carriers of bank bills, when the package in question was delivered, as of ordinary goods, wares and merchandize; and that the fact, that the defendants' boats, both line and ferry, had, since 1826, been in the habit of transporting bank bills, might well be regarded as a sort of practical construction of the charter by the defendants themselves.

The jury were farther instructed, that if they found, that the defendants received the package in question, directed to the Clinton County Bank, Plattsburgh, or to Richard Yates, Cashier, Plattsburgh, and assumed for hire to carry it, the general rule of law, in the absence of any contract or usage to the contrary, would oblige them to cause it to be delivered to the bank or consignee personally; or, if they delivered it to the wharfinger at Plattsburgh, they must cause notice to be given to the consignee of its arrival, and, until this was done, they must remain liable, as common carriers, for the property; and that, although the bills might have been stolen from

Ladd, this would not exonerate them; and the fact, that the boat did not stop long enough at Plattsburgh to give sufficient time to go to the bank and return, was no legitimate excuse for not delivering the money at its place of destination, but they should have stopped long enough to have done it, or should have caused it to be done by some agent for them.

The jury were farther instructed, that it was a question of fact, for them to determine, whether Phillips undertook to carry the money as the agent of the company, or as an individual; and upon this point they would examine the testimony bearing upon it, and, if he undertook to do it in his individual capacity, the company were not liable;—that, the defendants being common carriers of bank bills by force of their charter, Capt. Phillips was the proper agent to receive the package, and his acts, as agent, would bind the company, and the presumption would be, that he acted in the line of his duty, as agent; but that this presumption might be rebutted by evidence, and it was for the jury to inquire, whether it had been;— that the mere fact, that Phillips had received the perquisites to his own use, was not necessarily conclusive on the point, to whom the credit was given, either way, and did not necessarily make the defendants liable, or exempt them from liability; that if Phillips was permitted by the company to take the perquisites to his own use, and this was known to the bank, or to Seymour, when he delivered the package to Phillips, (which would be the same thing,) it would tend to prove, that the credit was given exclusively to Phillips, individually; but if the bank were not chargeable with such notice, still it was for the jury to determine, how much effect it should have, and they must find, from all the evidence in the case, with whom the contract was made,—whether it was the immediate undertaking of the company, through their agent, or was the undertaking of the captain personally;—and that the conversation between Phillips and Dr. Peck, as testified to by Phillips, was not of itself notice to the bank of such a fact, though it might be some evidence tending to prove such notice.

The jury were farther instructed, that if the defendants, through their agent, undertook to carry this money for hire, although the agent was allowed to take the hire to his own use, they were liable for not delivering it at its place of destination, unless

their common liability was so limited and modified by usage, that the defendants were discharged from farther liability upon the delivery of the package to the wharfinger at Plattsburgh;—that the liability of the defendants, as common carriers, might be limited by the general usage of the business, or the particular usage of these defendants; and that it was not necessary, that the plaintiffs should have known of the usage; and that, if the defendants have delivered the package according to the established usage of the business in which they were engaged, whether the plaintiffs knew of such usage, or not, they are discharged from farther liability;—and that the important place, in reference to which they were to inquire for the usage, was at Plattsburgh landing; and that the usage as to other landings could have no effect, except as bearing upon this point in one way, or another; and that it was difficult to see, how the usage at other landings could have much effect.

In respect to the character of the usage, which should be established, in order to modify what would otherwise be the duty of the defendants in regard to the delivery of this package, the jury were instructed, that it must be a uniform, well settled and notorious usage, and of such a standing, as to furnish a presumption, that the consignee might have known of it; and if it had such qualities, the plaintiffs were bound to have known it, whether they did, or not, and were affected by it. The jury were farther instructed, that if they found, that it was the general and usual course of business for the defendants to deliver the packages of bank bills to the wharfingers at Plattsburgh, when the boat run through to St. Albans, an occasional exception, by their delivering them to some safe person to carry to the bank, would not defeat the uniformity of the usage; and neither would it, if the mode of delivery in the spring and autumn, when the boat did not run through to St. Albans, were not uniform. The jury were also told, that it was for them to determine, from the whole testimony bearing upon it, whether such a usage is proved, as should, under the instructions of the court, modify the liability of the defendants, and discharge them, upon their delivery of the package in question to Ladd; but that cases, where the packages were consigned to the wharfingers, or the defendants had express directions to leave them with the wharfingers, could have no effect, in establishing a usage to modify the liability of the defendants.

The court, being requested by the plaintiffs to instruct the jury, as matter of law, that Ladd must be taken to have been the agent of the defendants, and by the defendants, that he could not be so taken, told the jury, that it was not a question of law, whose agent he was, but was a question of fact, for them to decide, and was a material fact in dispute; that he must have been the agent of the plaintiffs, or of the defendants, in taking charge of the package, and stand responsible to the one, or the other; and that, when the question was determined, whose agent he was, the great difficulty in the case would be solved.

The jury were also instructed, that the non-delivery of a bill of lading of the package of bills would not exonerate the defendants from liability, it being the neglect of the agent of the defendants; and, in addition to that, there being no evidence, that the plaintiffs, when they shipped the money on board, had any actual notice of that provision of the advertisement, or of the advertisement itself.

The jury were also instructed, that usage could not be set up in contradiction of any express agreement, and that, if they found, that there was an express agreement made by Capt. Phillips, as the agent of the company, to deliver the package to the bank at Plattsburgh, or to Richard Yates, Cashier, at the bank, the usage, in that case, became of no importance; and that, whether there was an express agreement, or not, must depend upon the testimony of Seymour and Phillips; and that, in weighing contradictory testimony, it was a rule of law, that, other things being equal, positive evidence preponderates over negative evidence,—the court explaining to the jury the nature of positive as well as of negative testimony.

The jury were instructed, that if the plaintiffs were entitled to recover, they should recover in damages the amount of the package of money which was lost; and that they might, in their discretion, add to such sum the interest upon it from the time of the loss to the time of trial, by way of increasing the damages, but were not bound to do so.

Verdict for plaintiffs.     Exceptions by defendants.

*C. Adams* and *D. A. Smalley* for defendants.

By the decision of the supreme court in this case, 16 Vt. 52, and 18 Vt. 131, the following propositions may be considered as estab-

lished;—that the duty and liability of the defendants is to be determined by the law applicable to carriers of this description;—that this liability may be established by express contract, by the general usage of the business, or by the defendants' particular usage;—that when goods are delivered to a carrier, marked for a particular place, without directions as to their transportation and delivery, except what may be inferred from the marks, the carrier is only bound to deliver them according to the general usage of the business in which he is engaged, whether the consignors knew of such usage, or not. *Noble* v. *Kennoway*, 2 Doug. 510. *Van Santvoord* v. *St John*, 6 Hill 157. 18 Vt. 131.

1. The county court decided, that the defendants were made common carriers of bank bills by the acceptance of their act of incorporation. The position assumed is, that it is by the charter, and not by the acts done under it, by what the defendants have power to do, and not by what they do, that they are constituted carriers. Every person, becoming a carrier, must necessarily have the power of limiting his bussiness to such articles, modes of conveyance, and course of business, as he chooses. Story on Bail. §§ 500, 508. It should have been left to the jury to say, whether the defendants had, by custom and usage, made themselves common carriers of bank bills; and the jury should have been instructed, that if they had made themselves liable in that way, a delivery according to the same custom and usage would discharge them. 16 Vt. 52.

2. The court farther directed the jury, that the general rule of law would oblige the defendants to deliver the package to the bank or consignee personally. This is directly opposed to the case of *Van Santvoord* v. *St. John*, 6 Hill 157, and to the decision in this case, 18 Vt. 131. The receipt may imply an obligation to deliver, —but *when, how,* or where, depends either upon some express contract, the general custom, or the usage that has prevailed between the parties. Story on Bail. § 543. 42 E. C. L. 357. 10 Met. 472. 1 Rawle 203. Ang. on Car. § 311. This being admitted, the plaintiffs were bound to prove the undertaking, as alleged; and there being no contract, they could only do this by proving such facts, growing out of the defendants' usage and course of business, as would warrant the jury in finding such undertaking; and here the burden of proof was upon the plaintiffs. 8 M. & W. 427. Ab-

bott on Ship. 463. *Birkett* v. *Willan et al.*, 2 B. & Ald. 358. The undertaking counted upon is not a legal result, but an inference from facts.

We insist, that the court, in effect, referred a question of law to the jury. The jury were directed, that it was for them to determine, whether such an usage was proved, as should, under the instruction of the court, modify the liability of the defendants, and discharge them upon the delivery of the package to Ladd. The character, extent and uniformity of the defendants' usage and the general course of business upon the lake were all facts for the jury to find; but the effect of such facts and their sufficiency to satisfy the undertaking was to be decided by the court. With respect to such facts there was but little controversy. The defendants admitted the receipt of the package, but the question was, whether this receipt involved an undertaking to make a personal delivery. There was no dispute, but what the defendants had delivered the package to the wharfinger, at the wharf; but the inquiry was, whether this was a legal delivery; and the court should have directed the jury what facts and what usage would discharge the undertaking.

3. The court erred in the application of the rule relative to weighing conflicting evidence. From this charge the jury must have understood, that the court considered the testimony of Phillips as negative, and as overbalanced by the testimony of Seymour,—whereas each of them testified to affirmative, but opposing, propositions. The rule is limited to those, who, though present when a given fact is alleged to have happened, did not observe it, and had no application to the case before the court. Gilb. Ev. 146. Swift's Ev. 146. 3 Stark. 82–89.

4. The court erred in admitting Seymour to testify as to his intent, when the intention was not expressed. The intent is an inference for the jury to draw from what was said and done.

5. The court erred, in not charging the jury as to the effect of Ladd's notice to the consignee, that he had the package of money for him.

*C. D. Kasson* and *A. Peck* for plaintiffs.

I.   As to the charge of the court, relative to the defendants being carriers of bank bills by the terms of their charter.

Farmers' & Mechanics' Bank *v.* Champlain Trans. Co.

1. It appeared, that packages of bank bills were usually transported by water, on the lake, at the time of the charter, and before and since,—that the defendants acted under their charter, and in this respect conformed to the existing usage on the lake,—and they had not attempted to narrow their charter, so as to exclude any article, ever transported on the lake. *Beach* v. *Packard*, 10 Vt. 96. The public had a right to treat these acts of other craft, in carrying money, as giving a construction to the charter ; and to regard the practice of the defendants as a practical construction of it by themselves. 18 Vt. 131. But it is not necessary, that it should have been usual to transport bills at the time of the charter. If it subsequently became usual to do so, the charter would extend to it. *Sewell* v. *Allen*, 6 Wend. 355. Story on Ag. § 131.

2. The defendants held themselves out as carriers of bank bills in the hand bills of 1839.

3. The case shows, that they had always been accustomed to carry bills. This would make them common carriers by usage ; and the only effect of the charge as to the charter is to determine the fact, that they were common carriers ; and as the case shows them such by two other means, that point becomes immaterial, as it could not have affected the result. 1 Aik. 43. 10 Vt. 525. 21 Vt. 52.

II. The fact was distinctly submitted to the jury, whether the defendants received the package and assumed for hire to carry it, or whether Phillips assumed in his private capacity ; and the verdict establishes the first to be true. The only question, then, is, whether the defendants were bound to a delivery to the consignee, or to the wharfinger and to give notice to the consignee, unless exempted by usage. That such has been the law from time immemorial is shown by the following cases. 16 Vt. 52. 18 Vt. 131. *Ostrander* v. *Brown*, 15 Johns. 42. *Lane* v. *Cotton*, 1 Ld. Raym. 652. *Hyde* v. *Tr. & M. Nav. Co.*, 5 T. R. 390. *In re Webb et al.*, 4 E. C. L. 159. Story on Bail. 343. *Hatchwell* v. *Cook*, 1 E. C. L. 488. *Bodenham* v. *Bennett*, 4 Price 31. *Duff* v. *Budd*, 7 E. C. L. 402. *Griffith* v. *Lee*, 11 E. C. L. 334. *Birkett* v. *Willan et al.*, 2 B. & Ald. 358. *Stephenson* v. *Hart et al.*, 15 E. C. L. 47. *Gulden* v. *Manning*, 3 Wils. 429. *Garnett et al.* v. *Willan et al*, 7 E. C. L. 19. *Mayell* v. *Potter*, 2 Johns. Cas. 371. Story on Bail. § 542. *Muschamp* v. *Lanc. & Prest. Junc. Railway Co.*, 8 M. & W. 421.

Ang. on Car. §§ 95–97, 281–315, 227. *Powell* v. *Myers,* 26 Wend. 591. 11 Met. 514. *Lewis* v. *W. R. R. Co.,* 1 Denio 45. *Pickett* v. *Downer,* 4 Vt. 21. And no rule of public policy requires a modification of this principle in this case. The defendants might have limited the extent of their undertaking, either by declaring it in the given case, or by a general usage; but they did neither, and to allow them to do so now would operate a fraud upon the plaintiffs. *Cole* v. *Goodwin,* 19 Wend. 251. Ang. on Car. § 318.

III. The charge, in reference to the authority of Phillips, as captain, to bind the defendants, was correct. The Winooski was a general ship and the public had a right to treat the captain as acting as captain, in relation to all matters concerning the transportation of property on board of her; and we claim, that as Phillips was a general agent, acting in the apparent course of his general business, his acts estop the defendants from showing an excess of his authority. *Sewall* v. *Allen,* 6 Wend. 351. *Allen* v. *Sewall,* 2 Wend. 327. *Thompson* v. *Davenport,* 17 E. C. L. 335. *Paterson* v. *Gandasequi,* 15 East 63. Story on Ag. §§ 126–128, 443–452. *Olney* v. *Wicks,* 18 Johns. 122. Ang. on Car. §§ 71, 318. *Williams* v. *Mitchell,* 17 Mass. 98.

IV. The fact, that Phillips appropriated the freight as a personal perquisite, was only material, as showing, that he did not act as captain; and it was submitted to the jury on this ground. For if he did receive the freight of any article as part of his pay for services, with the consent of his employers, the public are not bound to regard it, even though they knew it; and if he did it without their consent, he was only guilty of embezzlement and was bound to render an account of it to the owners. *Dwight* v. *Brewster,* 1 Pick. 54. *Allen* v. *Sewall,* 2 Wend. 327. *Bean* v. *Sturtevant,* 8 N. H. 146. *Sewall* v. *Allen,* 6 Wend. 350. Ang. on Car. §§ 573, 574. But especially would this be the case, unless the plaintiffs knew it; and there was no testimony that they knew it, except that of Phillips, that he told Dr. Peck in 1837. To thus charging the plaintiffs there are two objections. 1. Dr. Peck was at that time a director in the defendants' company, and it is to be not only presumed, that the information was given to him in that capacity, but the law will not allow information thus acquired to charge another principal in virtue of a different relation of the same person. *Hider* v. *Dorrell,*

1 Taunt. 383. *Cross* v. *Smith,* 1 M. & S. 555. 2. This not being communicated to him as a director, or agent, of the plaintiffs' bank, it is well settled, that it cannot affect the bank. Ang. & Am. on Corp. 247. *Hayward* v. *Pilgrim Soc.,* 21 Pick. 277. *Wash. Bank* v. *Lewis,* 22 Pick. 24. *Com. Bank* v. *Cunningham,* 24 Pick. 276. *Banks* v. *Martin,* 1 Met. 308. *Fulton Bank* v. *Benedict,* 1 Hall 495, 557. 4 Paige 136. 10 Mass. 403. 1 Caine 114.

V. The only quality required for the usage, for the plaintiffs' benefit, was, that it should be so well settled, as to furnish a presumption, merely, that the plaintiffs might have known it; and in this the county court were correct. *Crosby* v. *Fitch,* 12 Conn. 419. *Gibson* v. *Culver,* 17 Wend. 305. 16 Vt. 52. 18 Vt. 131. *Rushfuth* v. *Hatfield,* 7 East 228. *Wood* v. *Hickok,* 2 Wend. 504. *Stevens* v. *Reeves,* 9 Pick. 198.

VI. It was a question of fact, for whom Ladd was acting, and as such submitted, and the jury have found he acted for the defendants. The case shows, that the package was delivered to him, not as a depositary, but for the purpose of carrying to the bank. Story on Bail. § 542. Ang. on Car. §§ 138, 296, 304. *Forward* v. *Pittard,* 1 T. R. 27. *Hinsdale* v. *Partridge,* 14 Vt. 547. *Hyde* v. *Tr. & M. Nav. Co.,* 5 Tr. R. 389.

VII. The omission to execute a bill of lading by the captain is a neglect of their own servant, for which the plaintiffs are not responsible, even though they had notice of the advertisement; nor can the defendants limit their liability by any such notice. Story on Bail. § 561. *Cole* v. *Goodwin,* 19 Wend. 251. Or if they can, there is nothing to show the plaintiffs knew it,—which is indispensable to its availing the defendants. *Griffiths* v. *Lee,* 11 E. C. L. 334. *Brooke* v. *Pickwick,* 4 Bing. 218. Story on Bail. § 558. *Davis* v. *Willan,* 2 Stark. R. 279, [3 E. C. L. 346.] *Gibbon* v. *Paynton,* 4 Burr. 2302. *Evans* v. *Soule,* 2 M. & S. 1. A mere publication of notice is insufficient. *Kerr* v. *Willan,* 2 Stark. R. 53. *Clayton* v. *Hunt,* 3 Camp. 27.

VIII. It is well settled, that positive testimony preponderates over negative, other things being equal. 1 Stark. Ev. 516–518. It appears, that the court explained to the jury the nature of each, and it is to be presumed, that they explained correctly.

IX. The charge was sufficient upon the third request, for the

xxiii.    26

jury were told, that if the delivery was according to the usage of the defendants, it would discharge them. If, however, it turns on the point of the special contract, the authorities are abundant to show, that the defendants would be bound by such a contract, as being within the general scope of the captain's employment. *Davis* v. *Waterman*, 10 Vt. 526. *Munn* v. *Commission Co.*, 15 Johns. 54. *Fenn* v. *Harrison*, 3 T. R. 760. 15 East 407.

X. The point in reference to the answer of Seymour to the question, with whom he contracted, was properly left to the jury. *Hinsdale* v. *Partridge*, 14 Vt. 547. Ang. on Cor. § 140. *Allen* v. *Sewall, ub. sup.*

The opinion of the court was delivered by

REDFIELD, J. The facts, necessary to a full understanding of the points, now determined by the court, will be found sufficiently detailed in the reports of the same case, 16 Vt. 52, and 18 Ib. 131.

The first question is, What was necessary to constitute the defendants common carriers of bank bills?

The defendants' charter extends to the carrying of all commodities usually carried upon Lake Champlain at the date of the charter, and the proof showed, that bank bills were usually carried by the water craft upon that lake, at the time the defendants' company took their charter and went into operation. The words of the charter are, "All other articles and things usually transported by water on said Lake Champlain." This being so, there could be no doubt, the defendants' powers, as a corporation, extended to carrying bank bills. And something in the bill of exceptions looks as if the jury were told, that this did, *ipso facto*, and of necessity, constitute the defendants common carriers of bank bills. But this general proposition we do not think exactly maintainable. For the powers of natural persons, who should erect steamboats, and become carriers upon Lake Champlain, would be equally extensive with those of the defendants; but if they should confine their business to carrying other dissimilar commodities, we do not think they could be compelled to assume the risk of carrying bank bills, or specie. And so the court, in this case, seem to have viewed the subject in another portion of their charge, when they allude to the practice of this company, in carrying bank bills, as a practical construction of their own charter, and of their own obligations to the public under it.

But it seems to us, that this case is distinguishable from those, where it has been held incumbent upon the plaintiffs to show, by positive proof, that the company consented to the captain of their boat carrying money *on their account*, in order to hold the company responsible for the loss of the money. *Sewall* v. *Allen*, 6 Wend. 351, reversing the judgment in *Allen* v. *Sewall*, 2 Wend. 327, is one of that class of cases, so far as the determination of the court of errors is concerned. And that determination seems to meet with approbation in Angell on Carriers, § 101, and note 4. And STORY, J., in *Citizens' Bank* v. *Nantucket S. B. Co.*, 2 Story's R. 16, and Chancellor KENT, 2 Kent 609, seem also to approve the decision of the court of errors. But these cases, and the writers named, adopt this view of the subject, upon the ground that the charter of the company limits their business to the carrying of "goods, wares, and merchandize," and that bank bills are neither, and so the company *prima facie* not liable; and not liable in any event, unless they have given their consent to their proper business being enlarged, so as to include bank bills; and also that this was a suit against the stockholders in their individual capacity, under the charter. Upon this narrow view of that case the decision of the court of errors may stand; but, as applicable to a company, whose charter, on the face of it, does include the carrying of bank bills, and in a suit directly against the corporation, it seems to us the reasoning is altogether unsatisfactory and unsound. And unless that case is to be distinguished from the present, upon the ground of the restricted nature of the charter of that company, we should certainly incline to the opinion of the supreme court of New York, in *Allen* v. *Sewall*, rather than that of the court of errors. Mr. Justice STORY, (in 2 Story, *ut supra*,) seems to admit, that, upon general principles, the captain's contract will bind the company to the extent of the charter powers.

It seems to us, that when a natural person, or a corporation, whose powers are altogether unrestricted, erect a steamboat, appoint a captain, and other agents, to take the entire control of their boat, and thus enter upon the carrying business, from port to port, they do constitute the captain their general agent, to carry all such commodities as he may choose to contract to carry within the scope of the powers of the owners of the boat. If this were not so, it would

form a wonderful exception to the general law of agency, and one in which the public would not very readily acquiesce. There is hardly any business in the country, where it is so important to maintain the authority of agents, as in this matter of carrying, by these invisible corporations, who have no local habitation, and no existence, or power of action, except through these same agents, by whom almost the entire carrying business of the country is now conducted. If, then, the captains of these boats are to be regarded as the general agents of the owners,—and we hardly conceive how it can be regarded otherwise,—whatever commodities, within the limits of the powers of the owners, the captains, as their general agents, assume to carry for hire, the liability of the owners, as carriers, is thereby fixed, and they will be held responsible for all losses, unless, from the course of business of these boats, the plaintiffs did know, or upon reasonable inquiry, might have learned, that the captains were intrusted with no such authority. *Prima facie* the owners are liable for all contracts for carrying, made by the captains, or other general agents, for that purpose, within the powers of the owners themselves, and the *onus* rests upon them to show, that the plaintiffs had made a private contract with the captain, which it was understood should be kept from the knowledge of the defendants, or else had given credit exclusively to the captain. *Butler* v. *Basing,* 2 C. & P. 614.

But it does not appear to us, that the mere fact, that the captain was, by the company, permitted to take the perquisites of carrying these parcels, will be sufficient to exonerate the company from liability. Their suffering him to continue to carry bank bills ought, we think, to be regarded as fixing their responsibility, and allowing the captain to take the perquisites, as an arrangement among themselves. But we are aware, that the question, with whom was the contract, and to whom the credit was given, will generally be one, to some extent, of fact. Yet it seems to us, that the defendants have no ground of complaint with the general mode, in which this part of the case was disposed of in the court below. The law would have justified the judge, as we have before stated, in putting the case, upon this point, upon grounds far more unfavorable to them. Indeed, it seems to us, that, upon the facts stated, if we are not misinformed in regard to the general nature of the defendants' charter, there could be very little ground to raise any question, either of law

or fact, as to the defendants' liability, as common carriers of the parcel, so far as they undertook to carry it.

As to the notice, which was attempted to be proved, we do not see, but the proof of the loss of the remainder of the hand bill was sufficient, we are more inclined to adopt the view which the American cases have taken of this subject of notices, by common carriers, intended to qualify their responsibility, than that of the English courts, which they have in some instances subsequently regretted. The consideration, that carriers are bound, at all events, to carry such parcels within the general scope of their business, as are offered to them to carry, will make an essential difference between the effect of notices by them, and by others who have an option in regard to work which they undertake. In the former case, the contractor having no right to exact unreasonable terms, his giving public notice, that he shall do so, where those who contract with him are not altogether at his mercy, does not raise the same presumption of acquiescence in his demands, as arises in those cases, where the contractor has the absolute right to impose his own conditions. And unless it be made clearly to appear, that persons contracting with common carriers expressly consent to be bound by the terms of such notices, it does not appear to us, that such acquiescence ought to be inferred. But if, by the terms of the contract, the risk is in part or wholly, assumed by the owner of the things carried, the carrier would only be liable, probably, for ordinary neglect. The law of this subject will be found fully discussed in Mr. Angell's chapter upon this subject, § 232, *et seq.* ; see also Ib. § 220, *et seq.* It is certain from the English cases, that since the time of *Southcote's Case,* 4 Co. 83, it has always been considered, that any bailee might, by express contract, either increase or limit his common law responsibility. And such is the general current of the American decisions of New York. The cases of *Clarke* v. *Faxton,* 21 Wend. 153, *Hollister* v. *Nowlen,* 19 Ib. 234, and *Cole* v. *Goodwin,* Ib. 251, have undoubtedly settled the law in that state, that it is not competent for a carrier to limit his responsibility, by a notice brought home to the owner of the goods, at the time of delivery to such carrier; and these cases seem to assume the ground, that it is not competent for the carrier to so limit his responsibility, even by an express contract to that effect,—which we certainly should not re-

gard as law. This express contract ought, perhaps, to be very clearly proved, and in water carriage is usually required to appear in the bill of lading. But a mere general notice, when brought to the knowledge of the owner, ought not, perhaps, to have that effect, unless there is very clear proof, that the owner expressly assented to that, as forming the basis of the contract. But we regard it as well settled, that the carrier may, by general notice, brought home to the owner of the things delivered for carriage, limit his responsibility for carrying certain commodities beyond the line of his general business, or he may make his responsibility dependent upon certain conditions, as having notice of the kind and quantity of the things deposited for carriage, and a certain reasonable rate of premium for the insurance paid, beyond the mere expense of carriage. Angell on Carriers, § 245; 2 Greenl. Ev. 215; *Orange Co. Bank* v. *Brown,* 9 Wend. 85. But all this seems to us to have but a remote bearing upon the present case, as the notice, which was shown, had no reference to this particular boat, and is not shown clearly to have been brought home to the knowledge of the plaintiffs' agent, at the time of delivering the parcel; and there is not the slightest evidence of any assent upon his part to its terms, but the contrary is fully shown by the testimony of the captain.

The testimony of the teller, as to his purpose and intention at the time of delivery of the parcel, not in any way made apparent to others, we should not regard as of any legal importance towards the proof of the contract; and it does not very clearly appear, that it was intended to have any effect upon the case, or *did* have any effect, unless, possibly, to preclude one ground of inferential argument, on the part of the defendants; and it is not, in the course of jury trials, considered competent to introduce distinct evidence, to block up every possible avenue to argument. Such a rule would render trials almost literally endless. But from the view already taken of this portion of the case, perhaps this testimony would be regarded as of less importance in a future trial. At all events, we think it is not strictly admissible. The true remedy in such cases is, undoubtedly, where the judge has good ground to apprehend, that the jury may have been misled from the true points in issue in the case, by the argument of counsel, or in any other way, to set them right in the charge. And sensible lawyers never complain, when all the false

issues on both sides are uniformly swept out of all cases, and under such rules of trial they feel no disposition to build up shadows, or to beat them down,, but rather save their breath for more important matters; and this course undoubtedly brings a far greater proportion of the cases to a correct determination by juries, than where the counsel are permitted to contest every possible point, from the origin of matter, to the last discovery in mechanics, without any intimation to the jury by the court, that such things are rather matters of curious speculation, than any thing else.

It is in vain, we think, to make this a case, where notice to the consignee was required, or if given could have availed any thing. At all events, the notice, which was given after the parcel had been lost, is, according to all the cases, of no avail. For if it was incumbent upon the defendants to give notice, they were bound also to keep the parcel a reasonable time after the notice came to the consignee, *to enable him to come* and receive it. All the cases, and all the elementary writers, so far as I know, agree in this. So that the very fact of the defendants claiming, that the notice which was given should avail them, is a virtual admission of their liability up to that time, as carriers, which is sufficient to charge them in the action. But this seems to have been merely thrown out as a plank in shipwreck, without much consideration, and from which no certain benefit was expected.

What was said to the jury, in regard to the comparative importance of positive and negative testimony, is most undoubted law; and yet, if that was said, and nothing more, it is apparent, it might have operated unjustly against the defendants. It would, somewhat naturally, have led the jury to conclude, that the case ought to be determined, perhaps, upon the testimony of Seymour; when in fact it is not very apparent, under the circumstances of the case, how Seymour, or Phillips, should have known, with much certainty, precisely what was said, or was not said, at the time of the delivery and acceptance of the parcel; and it is more than probable now, that either the one, or the other, may very honestly testify to his mental conclusions, at the time, as positive declarations, or denials. But we are perhaps to suppose, that all this was fairly brought to the mind of the jury, together with the very strong improbability, that any special contract, in terms, should have been made, at the time,

if the same captain was in the constant practice of carrying similar parcels to the same place, for the same bank, and his practice in regard to the delivery to the wharfinger was made known to the plaintiffs and not objected to by them, as testified by Phillips,—thus making his testimony, in one view, almost as truly positive, as that of Seymour, but in a manner not so obviously so, perhaps.

The only difficulty, which the court, from the first, have ever felt, in this case, has been, in regard to the extent of the defendants' undertaking to convey the parcel; in other words, as to the extent and termination of the transit or carriage, by the defendants. The county court, in the trial of this case, seem to have assumed, that in the law of carriers there was a general, well defined rule, upon this subject, and that the defendants were attempting to escape from its operation by means of some local usage, or custom, in contravention of the general rules of law upon the subject. In this view of the case, the defendants were justly held to great strictness in the proof of the usage. It becomes, therefore, of chief importance to determine how far there is any such general rule of law, as that which is assumed in the decision of the case in the court below. If the law fixes the extent of the contract, in every instance, in the manner assumed, then most undoubtedly are the defendants liable in this case, unless they can show, in the manner required, some controlling usage. But if, upon examination, it shall appear, that there is no rule of law applicable to the subject, and the extent of the transit is matter resting altogether in proof, then the course of business at the place of destination, the usage or practice of the defendants, and other carriers, if any, at that port, and at that wharf, become essential and controlling ingredients in the contract itself.

There is no doubt, from the history of the carrying business in England until a late period, that the carriers employed their own porters to deliver their parcels, at the several stopping places on the route. A common carrier, by land, was then, in that country, of a distinct, well known, and well defined class of men, almost as much so as any public officer. And their character, responsibility and course of business being well settled and well known, those who dealt with them acted upon the faith of their making a personal delivery of their parcels, at their several stopping places. *Hyde* v.

*Tr. and M. Nav. Co.*, 5 T. R. 387, is decided upon this ground, and upon the additional fact, that the carriers charged for cartage to the house of the consignee, thus showing that they so understood the contract. *Stephenson* v. *Hart et al.*, 4 Bing. 476, assumes the same general rule, as applicable to carriers by land. But in this case it was considered a fair inquiry for the jury, " Whether the defendants had delivered the box according to the due course of their business, as carriers." There is also a class of cases, where the carrier has been held liable *in trover*, as for a tort, for delivery to a wrong person. *Duff* v. *Budd*, 3 Brod. & B. 177, is of this number. But in this case it was held to be matter of fact, for the jury, whether the defendant was guilty of negligence.

But this class of carriers, (by land and with wagons,) it must be borne in mind, is the very extreme case in the books, where the obligation to a personal delivery is held. And here even that rule is not regarded as altogether uniform and matter of course, but only the natural inference, in the absence of proof to the contrary. But this rule of law, if it may be called so, has never been applied to stage-coach proprietors, even who carry parcels, in this country, or certainly not uniformly. *Gibson* v. *Culver*, 17 Wend. 305, decides, that in such case, the obligation of the carrier only extends to the delivery of the parcels, according to the course of his business, at his usual stopping places.

There has been an attempt to push one department of the law of carriers into an absurd extreme, as it seems to us, by a misapplication of this rule of the carrier being bound to make a personal delivery. That is, by holding the first carrier, upon a route consisting of a succession of carriers, liable for the safe delivery of all articles at their ultimate destination. *Muschamp* v. *The L. & P. Railway Co.*, 8 M. & W. 421, is the only English case much relied upon in favor of any such proposition, and that case is, by the court, put upon the ground of the particular contract in the case; and also that " All convenience is " in favor of such a rule, " and there is no authority against it," as said by Baron ROLFE, in giving judgment. *St. John* v. *Van Santvoord*, 25 Wend. 660, assumed similar ground. But this court, in this same case, (16 Vt. 52,) did not consider that decision as sound law, or good sense; and it has since been reversed in the court of errors, *Van Santvoord* v. *St. John*, 6 Hill 158, and

this last decision is expressly recognized by this court. 18 Vt. 131. *Weed* v. *Schenect. & Sar. R. R. Co.,* 19 Wend. 534, is considered, by many, as having adopted the same view of the subject. But that case is readily reconciled with the general rule, upon this subject, that each carrier is only bound to the end of his own route, and for a delivery to the next carrier, by the consideration that in this case there was a kind of partnership connection between the first company and the other companies, constituting the entire route, and also that the first carriers took pay and gave a ticket through, which is most relied upon by the court. But see opinion of WALWORTH, Ch., in *Van Santvoord* v. *St. John,* 6 Hill 158. And in such cases, where the first company gives a ticket and takes pay through, it may be fairly considered equivalent to an undertaking to be responsible throughout the entire route. The case of *Bennett* v. *Filyaw,* 1 Florida 403, is referred to in Angell on Carriers, § 95, note 1, as favoring this view of the subject.

The rule laid down in *Garside* v. *Tr. & M. Nav. Co.,* 4 T. R. 581, that each carrier, in the absence of special contract, is only liable for the extent of his own route, and the safe storage and delivery to the next carrier, is undoubtedly the better, the more just and rational, and the more generally recognized rule upon the subject. *Ackley* v. *Kellogg,* 8 Cow. 223. This is the case of goods carried by water from New York to Troy, to be put on board a canal boat, at that place, and forwarded to the north, and the goods were lost, by the upsetting of the canal boat, and the defendants were held not liable for the loss, beyond their own route. The cases all seem to regard this as the general rule upon this subject, with the exception of those above referred to; one of which, (8 M. & W. 421,) considers it chiefly a matter of fact, to be determined by the jury as to the extent of the undertaking; one (25 Wend. 660,) has been disregarded by this court, and reversed by their own court of errors, (6 Hill 158;) one, (19 Wend. 534,) is the case of ticketing through, upon connected lines; and one, (1 Florida 403,) I have not seen.

But the rule of law and the course of business, in regard to carriage by water, have always been considered different from land carriage. In regard to foreign carriage, it is perfectly well settled, that a delivery at the wharf, even without notice, unless there be some special undertaking in the bill of lading, is sufficient. The

consignee is presumed to have received, from his correspondent, a copy of the bill of lading, and he is bound to take notice of the time of the arrival of the ship.  *Cope* v. *Cordova*, 1 Rawle 203.  Ang. on Car. § 312, 313, *et seq.*  2 Kent 604, 605, and notes.  The cases are all one way in regard to foreign carriers, by water, upon this point.

But a distinction is attempted, in most of the cases, between the foreign and the internal and coasting carrying business, in regard to the delivery or landing upon the wharf being sufficient to exonerate the carrier.  *Ostrander* v. *Brown*, 15 Johns. 39, holds, that such a deposit is not sufficient.  The carrier must continue his custody, till the consignee has had sufficient time, after the landing of the goods, and notice to him to come and take them away.  After that the carrier may put them in storage.  But we apprehend the rule here laid down will be found to have been very essentially qualified by the course of business, and the decisions since that time.  The steamboats and railways now almost monopolize the carrying business.  And the largest amount is perhaps, already, in this section of the country, done by railways.  Their course of doing the business is, as is well known, to build storehouses of their own at all the stations, and upon the arrival of the goods put them immediately in storage, without giving notice to any one.  In *Thomas* v. *The Boston and Prov. R. R. Co.* 10, Met. 472, it is clearly shown, that the carrier was not liable, as such, after the goods were put in storage.  And this decision seems to us to rest upon the most satisfactory grounds.

And in regard to water carriers, a somewhat similar course is, almost of necessity, now pursued.  The rapidity of the operations, and the vast amount of business necessary to be done, upon these great thoroughfares, almost absolutely preclude the possibility of securing a personal delivery, or notice to the consignee, without a most disproportionate increase of the expense of freight, which the owners do not wish to incur.  It would then, as it seems to us, be most unjust and unreasonable, to require this labor to be performed by carriers without compensation.  When the water carrying business, at a particular point, is in the hands of one company exclusively, there is no reason to doubt, that they might erect their own storehouses and conduct the business much as the railway companies do.

But this is seldom the case. And the owners of the wharves usually erect their own storehouses, and appoint some one to take charge of goods and parcels, delivered at their wharf by the different water craft. This person, denominated the wharfinger, is as much a public person, as the carrier himself; and when the carrier, by steamboat, or other vessel, in the due and common course of his business, delivers his goods or parcels, into the custody of the wharfinger, upon the wharf, we have no doubt, unless there is some practice or usage to the contrary, the transit is ended, and his responsibility, as carrier, ceases. That was so considered by this court, in *Sawyer* v. *Joslin*, 20 Vt. 172, in a case where every member of the court considered that the justice of the case required the *transit* to be prolonged to its utmost legal extension. And still we felt compelled to say, that upon the delivery upon the wharf, where the consignee was accustomed to receive his goods, the transit was at an end, and the goods, in contemplation of law, had reached the consignee.

The case of *Chickering* v. *Fowler*, 4 Pick. 371, shows, that a delivery at the wharf, in the due course of business, is a delivery to the consignee. *Quiggin* v. *Duff*, 1 M. & W. 174, and *Packard* v. *Getman*, 6 Cow. 757, indirectly favor the same view of the subject. And all the cases, almost without exception, regard the question of the time and place, when the duty of the carrier ends, as one of contract to be determined by the jury, from a consideration of all that was said by either party, at the time of the delivery and acceptance of the parcels by the carries, the course of the business, the practice of the carrier, and all other attending circumstances, the same as any other contract, in order to determine the intention of the parties. The inquiry, then, in the present case, must come to this before the jury, whether it was reasonable for the plaintiffs, under the circumstances, to expect the defendants to do more than to deliver the parcel to the wharfinger? If not, then that was the contract, and that ended their responsibility, and the plaintiffs cannot complain of the defendants, because the wharfinger was unfaithful. The defendants, unless they have, either expressly or by fair implication, undertaken, on their part, to do something more than deliver the parcel to the wharfinger, are no more liable for its loss, than they would have been, had it been lost upon ever so extensive a route of successive carriers, had it been intended to reach some re-

mote destination in that mode.   But if the plaintiffs can satisfy the jury, that from the circumstance attending· the delivery, or the course of the business, they were fairly justified in expecting the defendants to make a personal delivery at the bank, they must recover ; otherwise it seems to us the case is with the defendants.

This was the view taken of this case, when it first came before this court, and distinctly expressed, as we supposed, by the learned chief justice,—who then said, " But when it is understood by the contracting parties, that the carrier is to deliver them to another," (that is, the wharfinger,) " or at a place certain," (that is, the wharf,) " the duty of the carrier terminates at that particular place; and the responsibility ceases on the delivery, at that place, to and the receipt by any person authorized there to receive them."    And the same is substantially re-affirmed by the learned judge, who delivered the opinion of this court in 18 Vt. 131.

A great deal more might be said, undoubtedly, in regard to the just ground of expectation in the present case, that the defendants would make a personal delivery at the bank, aside from any special contract to that effect.   It is true, the parcel was a valuable one, but one like others constantly carried on the same route, as it would seem.   The plaintiffs had no right to expect the defendants to delay their boat sufficient time to go to the bank, if the usual course was merely to touch at the wharf sufficient time to unload and load passengers and freight.   The claim, thát the defendants should delay sufficient time to make a personal delivery of this parcel, implies, also, that they should do the same as to all their freight, which might take, in some instances, perhaps, a large portion of the day.   Then, as to their taking the responsibility of the faithfulness of the wharfinger, we see no reason in it whatever, unless they so contracted to do, any more than that they should be bound for the safe delivery of all their freight at its ultimate destination, however remote.   This is a risk, which, in the absence of all contract, should naturally and justly fall upon the plaintiffs, for whose benefit the wharfinger was acting.

It might be consoling to the carriers and to others, if we could lay down a rule of law somewhat more definite in this case.   But from the almost infinite diversity of circumstances, as to steamboat carriage, that is impossible.   There will usually be, at every place,

some fixed course of doing the business, which will be reasonable, or it would not be submitted to, and which will be easily ascertained on inquiry, and with reference to which contracts will be made, and which it is equally the interest and the duty of both parties to ascertain, before they make contracts, and which it would be esteemed culpable negligence in any one not to ascertain, so far as was important to the correct understanding of contracts, which he was making.

The fact, that the wharfinger made no charge to any one for delivering these parcels, and that he expected similar favors from the steamboat captain in return, so to speak, does not seem to us decisive at all, upon the question of the undertaking of the defendants, although, no doubt, entitled to consideration, in connection with the other facts. If he had made a charge, he might have demanded it upon the delivery of the parcel, or if the captain of the boat had actually received the whole freight in advance, expecting to pay a portion to the wharfinger, it would certainly not be decisive, as to the termination of the liability of the carrier, as such. On most of our routes, it is common sometimes to take pay in advance, even beyond the first route. And in such cases, where there is no connection between the two routes, in the way of business, if the first carrier delivers his parcel, at the end of his route, to the next carrier, and pays him what remains of the advance pay, he is no doubt exonerated. But it does seem to us, that this portion of the case makes more strongly in favor of the plaintiffs, than any thing else in the case, at present.

Judgment reversed and case remanded.

NOTE BY REDFIELD, J. A more minute examination of some of the cases, referred to in the foregoing opinion, will serve, we think, to confirm the views, which we have taken of this case, and the result to which we have come.

*St. John* v. *Van Santvoord,* 25 Wend. 660, was the case of a box of merchandize, marked " J. Petrie, Little Falls, Herkimer County," put on board the defendant's tow-boat of the Swiftsure line, at New York, the defendant executing a general receipt describing the box by its marks .The defendant's boat only went to Albany. This was not known to the plaintiff, but would have been readily ascertained upon inquiry. The box was carried safely by the defendant, and put on a canal boat at Albany, for Utica, Little Falls being on the route. Before the box reached its destination, it was rifled of its contents.

At the trial in the lower Court the jury were told, that the custom of the trade determined the rights of the parties, there being no contract, expressed or implied,

to carry beyond Albany. The Supreme Court held, that the fair import of the defendant's undertaking was to deliver the box at Little Falls, whether their route extended there or not. But had the defendant expressed in the receipt the true nature of the facts known to them, they would have been liable, as carriers, only to Albany, and as forwarders from that point. It seems, then, that the difference chiefly consisted in the view, which the Supreme Court took of the necessity of the defendant's bringing home to the knowledge of the plaintiff the course of their business.

In the Court of Errors, the Chancellor, who delivered the leading opinion, in favor of reversal, (the case being reversed 15 to 5,) places stress upon the consideration, that there was no connection in business, between the defendant's line and the remainder of the route. He says, also in addition to what is quoted from his opinion by KELLOGG, J., in this case, when last before this court, "If the owner of the goods neglects to make the *necessary inquiries as to the usage and custom of the business,* or to give *directions as to the disposal of the goods, it is his own fault,* and the loss, if any, after the carrier has performed his duty according to the ordinary course of his trade and business, should fall upon such owner and not upon the common carrier." The Chancellor argues farther, that, from the circumstances, the plaintiffs had no right to expect a personal delivery by the defendants, and therefore the law did not require one. The Chancellor also regards the case of *Weed* v. *Saratoga and Schenectady R. R. Co.*, 19 Wend. 534, as influenced a good deal by the consideration of the connection in the routes. But the court, in deciding that case, seem to put the case more upon the fact of taking fare and giving a ticket for the whole route, which in practice is seldom or never done, except when there is a *quasi* partnership throughout the route.

Upon farther examination of the case of *Gibson* v. *Culver*, 17 Wend. 305, it will appear, that Justice COWEN seems to suppose, that the carrier by stage-coach is, in the first instance, bound to a personal delivery, and that, in order to exonerate himself from that obligation, he must show a custom, or usage, of such notoriety, as to justify the jury in finding, that it was known to the plaintiffs, and that was all it was necessary to hold in that case to excuse the carriers. But in 6 Hill 158, this view is altogether overruled, and the more rational one established, that if one is ignorant of the course of business on the route, he is bound to make inquiry, and cannot make a contract with his eyes shut, and thereby impose a greater obligation upon the other party, in consequence of his own blindness! *Ackley* v. *Kellogg*, 8 Cow. 223, was the case of carrying, by sloop, from New York to Troy, and then forwarding to Granville, N. Y., by canal boat. The goods were lost by the upsetting of the canal boat. It was held to be a question of fact for the jury, whether the defendants had forwarded the goods, according to the expectation of the parties, at the time of delivery. *Chickering* v. *Fowler*, 4 Pick. 371, was the case of receiving and giving a receipt for 193 barrels of onions. The obligation of the contract was in these words, " Which I promise to deliver to Mr. Thomas Haven of Portsmouth, he paying freight for the same," as express as could well be conceived. The defendant went to the Pier wharf in

Portsmouth, "where vessels very frequently go to deliver goods," and "gave [Haven] notice that the onions were there for him." Haven told the defendants he must deliver them at his wharf in P., or he would not receive them, which defendant refused to do, and put them on that wharf, where they were frozen. It was held to be a question of fact for the jury, whether the plaintiff's contract was such with the consignor of the onions, that he was bound to receive and take care of the onions. If so, the court held, that he was bound to take them, where they were landed, unless there was some contract shown to deliver them at a particular wharf. *Thomas* v. *The Boston & Prov. R. R. Co.*, 10 Met. 472, was where one roll of leather, out of four, which had been carried on the defendant's road to Boston, and put in the depot, and two of them delivered to the plaintiff's agent, was lost, only one being then to be found. The court held, that the important question was, "How long the relation of common carrier continued?" "Carriers," say the court, "are bound to deliver goods according to their contract." "From the very nature and construction of the road, the proprietors cannot deliver goods at the warehouse of the owner. They must deliver at the depots." "And after such delivery at the depot, the carriage is ended," and the liability as common carriers ceases after depositing the goods in the company's warehouse. *Garside* v. *Tr. & M. Nav. Co.*, is cited and approved, as the true basis of the present law upon that subject. The extent of the transit was, in the common pleas, submitted to the jury by Ch. J. WELLS, and no objection was made to this course by either court or counsel. It seems to have been conceded, that that was a question of fact, under proper instructions, when there is any conflict in the evidence as in the present case there undoubtedly is. In *Citizen's Bank* v. *The Nantucket Steam Boat Company*, 2 Story's R. 16, while in terms STORY J., does approve the reasoning of the Court of Errors in *Sewall* v. *Allen*, he also assumes propositions in the law of agency, as well settled, in the course of his opinion, which seem to me fully to justify the opinion of the Supreme Court, if the charter had conferred general powers upon the company to carry bank bills and all other commodities. The learned judge admits, that the captain is to be regarded as the general agent of the company, and as such can bind them to the extent of their general powers, which is all we hold in the present case.