### FATMAN & CO. *v.* THE CIN., HAM. & DAYTON R. R. CO.

#### (No. 3,698.)

1. Where a contract is made with a railroad company to carry freight *by railroad* from one point to another (as from Cincinnati to Philadelphia), at a specified price for the whole distance, with a stipulation that the company shall not be held accountable for any damage or deficiency in packages, if receipted for "in good order" by another company, at some intermediate point on the route; and afterward the goods are receipted for "in good order," and carried a part of the distance *by water, on vessels,* and the goods are proved to have been damaged while in transit, the first named company is liable for such damage. The contract is an entirety; the company are carriers for the whole distance, and are liable according to the legal obligations imposed on them as carriers: they are to carry the goods without loss or damage, save those arising from inevitable accident or public enemies, and by changing the route they assume the risk of safe transportation.

2. The clause, "if receipted for in good order," etc., is not to be taken as absolutely releasing the carrier, in any event, from responsibility in case of loss of goods, but only from responsibility for losses occurring *without any fault* of the carrier, or agents employed by him.

3. When a loss is shown to exist the law raises the presumption of negligence against the carrier, and on him rests the burden of proof to show the loss or damage occurred without his fault, or the fault of those employed by him. When such negligence exists he can not avoid responsibility; he can only excuse himself for a failure to deliver, or for damages to goods, by showing that, *without his fault,* he has been prevented by some one of the causes recognized by law. This principle applies as well to the agents of the carrier, or sub-contractors, as to the carrier personally.

SPECIAL TERM.—This was an action brought to recover damages for a breach of contract, as common carrier. In the month of May, 1855, the plaintiffs delivered to the de-

fendants 500 cases of tobacco, to be carried from points along the defendants' road to Philadelphia, at sixty cents per one hundred pounds. Upon the shipment of the tobacco, from time to time, the defendants delivered to the plaintiffs bills of lading of the following tenor:

"Received of Fatman & Co., in apparent good order, —— cases of tobacco, —— pounds, to be forwarded to Fatman & Co., Philadelphia, at 60 cents per 100 pounds, marked," etc., "which the Cincinnati, Hamilton & Dayton, and Mad River & L. E. Railroad Companies, and the railroads with which they connect, agree to forward from Cincinnati to Philadelphia upon the following conditions: That the shippers and owners do hereby release said road, and those with which they connect, from liability from breakage," etc., (to certain specified articles,) "damage to hay, or other bulky article requiring shipment in open cars," etc. "It being also agreed between the parties hereto that the said Cincinnati, Hamilton & Dayton and Mad River & L. E. Railroad Companies shall not be held responsible for any damage or deficiency in packages, if receipted at Sandusky in good order." Signed, etc.

The packages were carried on the Cincinnati, Hamilton & Dayton and Mad River & L. E. Railroad Companies to Sandusky, and by the agent of the Sandusky road were delivered, one parcel on board the steam propeller "Baltic," and the residue on the steamer "Hudson," and the agent received from the masters of said steamers bills of lading, as follows:

"Shipped *in good order*, by L. H. Lewis, agent, as agent and forwarder, for account and risk of whom it may concern, on board the steamer ——, the following articles (*i. e.*, the cases of tobacco), which are to be delivered in like good order at the port of Buffalo, danger of navigation only excepted, unto consignees, paying charges, as specified below. In witness whereof," etc. Signed.

*Kebler & Force* for plaintiffs.

*Worthington & Matthews* for defendants.

SPENCER, J.   It is in proof, on part of the plaintiffs, that the tobacco was put up in good order, and was not damaged when delivered to defendants, but that when it was received at Philadelphia it was considerably damaged, to the amount, say, of $414, the boxes being in some way exposed to *wet*. At what point of their transit, or how they became wet, is not apparent.

The authority of the defendants to make a contract of transportation extending beyond the limits of their own road is admitted, to the extent of such authority on the part of other railroads, the defendants waiving exemption, if any, arising from the peculiar terms of the contract.   We have decided in repeated cases, in general term, that a railroad company may make such a valid contract, extending beyond the limits of their own road, whether as carriers or as forwarders, adopting the principle laid down in the case of *Noyes* v. *The Rutland & Burlington R. R.*, 1 Williams, 110, where it is said: "It seems to be now well settled that railroads, as common carriers, may make valid contracts to carry beyond the limits of their own road, either by land or water, and thus become liable for the acts and neglects of other carriers in no sense under their control."   (Cites 8 M. & W. 421; 19 Wend. 534; 23 Verm. 186.)   Carriers, whether natural or artificial, may contract to carry beyond their own limits, and, in such cases, can only exonerate themselves by personal delivery.   23 Verm. 186.   Such contracts are within the scope of their general business, though not within the strict terms of their charters.   5 Cush. 69.

It should be observed that there is no proof in the case that the goods were carried forward from Sandusky by *railroad*, or that the defendants had any connection with *other railroads* at Sandusky; on the contrary, the tobacco, it appears, was forwarded from Sandusky to Buffalo by *water* transportation, and receipted for, not by other railroads, but by the owners of steam vessels on the Lake.   If it should

be claimed, therefore, under the contract, that the tobacco was to be transported by railroad by the defendants, in conjunction with other railroad companies connecting with them at Sandusky, between whom and the plaintiffs *several* liabilities were created, so as that the tobacco, upon being " receipted for at Sandusky in good order," by such other companies, or some one of them, the liability of the defendants ceased, and from thence forward, the sole burden and risk of its transportation was assumed by such other companies, to whom, alone, the plaintiffs were to look in case of loss, it must be *assumed* that the transportation from Sandusky was to be by *railroad*, and that the liability of the defendants, in respect of such further transportation, did not cease unless the tobacco was delivered to, and receipted for in good order, by such other *railroad* company. Under this construction of the contract the defendants have not complied with its terms, and are not shielded thereby from liability, whether as common carriers or as forwarders; for, by changing the route, they assumed the risk of safe transportion. If it be claimed, however, that the defendants, having connection with other transportation companies to Philadelphia, were at liberty to select the route (whether by land or by water), east of Sandusky, then it must be for the reason that they alone undertook to be the *carriers* for the whole distance, and thus they became *sole* parties to the contract of transportation, and liable according to the legal obligations it imposed upon them. The contract is undoubtedly *entire*. The defendants undertook to " forward" this tobacco from the place of shipment on their road to Philadelphia, and over the entire distance, the consideration for its performance is an *entire* sum. The capacity in which they contract is the same for the entire distance, whether as *carriers* or *forwarders*, but as carriers for one part of the distance and forwarders for the residue. The plaintiffs have made no contract for transportation with any other party, and have no claim against any other. It is equally plain that the defendants were not mere forwarders from the com-

mencement. Part of the journey was performed over their own road ; as to that, they could be nothing else than carriers. If carriers as to *part*, then carriers as to the *whole*.

The words "to forward," as used in this contract, are to be construed in connection with the business of the defendants as *carriers*, and should be taken as signifying "to carry forward," not "to deliver to others for carriage." *Blossom* v. *Griffin*, 3 Kernan, 569–71. The case of *Collins* v. *The Bristol and Exeter R. R. Co.*, 11 Exch. 790, is very strongly in point upon the question under consideration. There property was delivered by the plaintiff to the Great Western Railroad Co., at Bath, to be conveyed to Torquay, in Devonshire, for which a receipt was signed as follows : "Bath Station, August 7th, 1853. Received the undermentioned goods on the conditions stated on the other side, to be *sent* to Torquay Station, and delivered to R. C. Collins, consignee, or his agent." (Then follows a description of the goods.) On the back of the receipt were the conditions referred to, by the fourth of which the company was absolved from accidents by *fire*, and by the tenth of which it was provided that the company would "*forward* goods consigned beyond the limits of their own road, by other carriers—the charges of such carriers to be added to those of the company, and any money received by the company, as payment for conveyance by other carriers, beyond their limits, to be received only for the *convenience* of consignors, to be paid over to such carriers, and not as a charge made by the company in the capacity of *carriers*, beyond the extent of their own railway; delivery by the company to be considered as complete when the goods are received by such carriers for further transportation, the company not to be responsible for any loss, damage or detention, beyond the limits of their own road." In going from Bath to Torquay, the goods had to pass over three roads in the line, of which that of the Great Western was the first, and the Bristol and Exeter the second. The goods were safely passed over both roads, but while they were in depot, awaiting delivery to

the third, they were consumed by *fire.* It was claimed on the part of the plaintiff, that there were *three* contracts, made with three different companies, and that the exemption from fire extended only to the Great Western Railway Company, but the court held, that " the contract for the conveyance of the goods was *one* contract, made with the Great Western alone. They contracted in terms, upon the face of the receipts, to carry the goods from Bath to Torquay; and if anything is contained in the tenth condition *repugnant* to this contract, it could not affect it." Being an *entire* contract, and that of the Great Western, the condition (exemption from loss by fire) extended through the whole route, and, therefore, the plaintiff could not recover.

Treating this contract then as entire, and the defendants as carriers for the whole route, what are the obligations which it imposes upon the defendants? They are, undoubtedly, to carry the tobacco from the place of shipment to Philadelphia, *without loss or damage,* save that arising from *inevitable accident* or public enemies, unless exempted by that clause of the contract, which declares that they " shall not be held accountable for any damage, or deficiency in packages, if receipted at Sandusky in good order." The effect of this clause, then, is to be considered. Without question the defendants are liable to all the responsibilities of common carriers, until the property arrives at Sandusky, and is receipted for in good order. Receipted for by whom? By the defendants' agents, for further transportation. Now, the defendants having stipulated as carriers, to take this property to Philadelphia, were not at liberty to say that, if received by their agent at Sandusky, they would not be bound to carry it *further,* nor be responsible therefor, if damaged or wholly lost, by the *negligence* of their servants, however great. The first branch of such a condition is repugnant to the *terms* of the agreement to carry, and the latter is contrary to public policy, and void.

It is undoubtedly true that a common carrier may limit his common law responsibility by special contract, but not

so as to shield him from liability in case of neglect. Public policy forbids this. The reason assigned in the well considered case of *Graham & Co.* v. *Davis & Co.*, 4 O. S. 362–377, is that the public are interested, generally, in the performance by car. ers of their duties, inasmuch as it often happens that many a dertakings are included in the same act of transportation—the property and persons of several individuals being involved in the *same venture*, whatever has a tendency to render the carrier careless, as to the person or property of one involving hazard to the person or property of another, by "diminishing the motives for the discharge of duty," and thus "it is against public policy, because it takes from the public a part of the security they would otherwise have." Hence, it is said, that "a loss from negligence can not be within the stipulated exceptions to the carrier's liability, and he can only excuse himself for a failure to deliver the goods entrusted to him, by showing that *without his fault* he has been prevented by some one of the causes recognized by law, or specifically provided for in the contract." Ib. 379. This principle of public safety applies as well to the agents of the carrier, or subcontractors employed by him in the performance of their duties, as to the carrier *personally*. No inducements should be allowed by which they may be rendered less careful. Should the carrier be subjected for their acts of negligence, he may stipulate for indemnity, or have recourse upon *them*.

In the construction, then, of the stipulation contained in the contract under consideration, it is not to be taken as absolutely releasing the defendants, in any event, from responsibility in case of a total or partial loss of the goods, provided they be received in good order by the defendants' agents at Sandusky, but only from responsibility for losses occurring without any *fault* of the defendants or the agents employed by them to carry the property forward from that place to the place of destination.

Now we have seen that, in all cases, the burden of proof rests upon the carrier to show that the loss or damage has

occurred without his fault, or any fault of those employed by him, and when a loss is shown to exist, the law raises the presumption of negligence against the carrier. Ubi. Supra. 374; 2 Greenl. Evi., sec. 219; Angel on Carriers, sec. 202; Story on Bail. sec. 529. 'Where such negligence exists he can not avoid responsibility. In the present case it is shown that damage has accrued to the plaintiff's property while in the hands of the defendants as carriers. The defendants have not shown how that damage occurred, or that it happened without any fault of theirs, or of their agents. It must be imputed to their negligence, and they should be held responsible for it.

Judgment for plaintiff.